ORIGINAL

**FILED**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

04 AUG 30 PM 4:3?

U.S. DISTRICT COURT
N.D. OF ALABAMA

CLELL L. HOBSON,

and

ROSA KELLY,

and

JOHN A. NIXON, JR.,

and

Case No. CV-004-C-2351-W

JEROME and CHARRETTA ROBERTS,

    Individually, and as Representatives of a
    Class of Consumer Borrowers,

                    Plaintiffs,

**v.**

IRWIN UNION BANK AND TRUST
COMPANY, an Indiana corporation,

SERVE:
ATTN: Matthew F. Souza
500 Washington St.
Columbus Indiana 47201,

and

HOUSEHOLD FINANCE, INC.
A Delaware corporation,

SERVE:
The Corporation Trust Company
1209 ORANGE STREET
Wilmington, Delaware  19801,

and

WILSHIRE FUNDING CORPORATION

i

a Delaware corporation,

SERVE:
  CSC Lawyers Incorporating Service, Inc.
  150 S. Perry St.
  Montgomery, Alabama 36104,

and

RESIDENTIAL FUNDING
CORPORATION
(a/k/a RFC, a/k/a GMAC-Residential Funding
Corporation, a/k/a GMAC-RFC) a Minnesota
corporation,

SERVE:
  The Corporation Company
  2000 Interstate Park
  Suite 204
  Montgomery, Alabama 36109,

and

JP MORGAN CHASE BANK
f/k/a THE CHASE MANHATTAN BANK
a New York corporation,

SERVE:
  The President or Managing Agent
  4 New York Plaza
  13th Floor
  New York, NY 10004,

and

FAIRBANKS CAPITAL CORPORATION,
a Utah Corporation and wholly owned
subsidiary of Fairbanks Capital Holding
Corporation, a Delaware corporation,

SERVE:
  Thomas D Basmajian, CEO & Chairman
  3815 South West Temple
  Salt Lake City, UT 84115,

and

CONSECO, INC.,
a Delaware corporation,

SERVE:
  John R. Kline or his successor
  Sr. Vice President
  11825 North Pennsylvania Street
  Carmel, Indiana, 46032

and

MOREQUITY, INC.,
a Delaware corporation,

SERVE:
  CSC Lawyers Incorporating Service
  150 S. Perry Street
  Montgomery, Alabama 36104,

and

COMMUNITY BANK OF NORTHERN
VIRGINIA,
a Virginia corporation,

SERVE:
  David P. Summers, or his successor
  President and CEO
  8150 Leesburg Pike
  Vienna, Virginia 22182,

                  Defendants.


## FIRST AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

The Defendant Banks ............................................................................ 1

The Third Circuit Appeals ................................................................... 2

The Nature of the Predatory Lending Claims - An Overview ................................ 5
  A. The Banks' Bait and Switch Tactics ........................................................ 5

  B. Concerted Concealment of Federally Mandated Disclosures................ 5

  C. TILA, HOEPA, RESPA and RICO Jurisdiction....................................... 7

  D. HOEPA's Three-Business-Day-Before-Closing Disclosure Rule ........... 8

The Banks' and the Shumway/Bapst's "Rent-A-Bank-Charter" Scheme ............... 8

  a.    Violations of TILA and HOEPA for
        Inaccurate Finance Disclosures ....................................... 10

  b.    Violations of TILA and HOEPA for
        Untimely HOEPA Notices ........................................... 11

  c.    Violations of HOEPA by Using Inconspicuous
        Type Sizes in HOEPA Notice Disclosures .................................... 12

  d.    Falsification of HOEPA Notices'
        Acknowledgement of Date of Receipt ........................................... 13

  e.    Facial Invalidity of HOEPA Notices'
        Acknowledgement of Date of Receipt ........................................... 13

  f     Violating HOEPA by Non-Disclosure of Bar to
        Prepayment Penalties in Refinancings............................... ... 14

  g.    RESPA Violations for Illegal Kickbacks and Fee-Splits .............14

The Parties, Jurisdiction and Venue ....................................................... 16

  The Plaintiffs ...................................................................... 17

  The Defendants ...................................................................... 16

  Jurisdiction and Venue ............................................................. 23

Factual Background ...........................................................................25

The Predatory and Fraudulent Lending
Scheme in Greater Detail ...................................................25

The Roles of the Assignee Defendants in the
"Rent-a-Charter" Predatory Lending Scheme................................... 28

Termination of the Fraudulent Predatory Lending Scheme................... 31

Assignee Liability................................................................33

The Plaintiffs' Loans................................................................33

The HOEPA Mortgage Loan of Mr. Clell L. Hobson........................... 34

The HOEPA Mortgage Loan of Captain Rosa Kelly............................37

The HOEPA Mortgage Loan of Reverend John A. Nixon, Jr................. 39

The HOEPA Mortgage Loan of Mr. & Mrs. Jerome Roberts.................. 41

Equitable Estoppel, Equitable Tolling and Class Action
Tolling of Limitations Periods ...................................................43

Class Action Allegations ................................................................46

The Plaintiff Class................................................................46

The Defendant Class................................................................51

Causes of Action Against Defendants ................................................... 53

**COUNT I**
Violations of TILA, as Amended by HOEPA, for
Concealment of Fraud and Withholding of
Material Disclosures................................................................. 53

**COUNT II**
Violations of TILA, as Amended by the HOEPA, for
Failure to Make Timely Disclosures of the APR
and Finance Charges................................................................58

**COUNT III**
Violations of the Real Estate Settlement Procedures Act.......................61

**COUNT IV**
Violation of the Racketeer Influenced and Corrupt
Organizations Act, 18 U.S.C. § 1962(c) and 1962(d)............................63

Prayer for Relief ................................................................68

## FIRST AMENDED CLASS ACTION COMPLAINT

The above-named Plaintiffs hereby amend the entirety of their original Class Action Complaint filed July 30, 2004, by substituting in lieu thereof the following allegations of this First Amended Class Action Complaint ("First Amended Complaint"). Filed herewith is an Appendix of Exhibits that is incorporated herein by reference.

## THE DEFENDANT BANKS

1.     This action is brought by a Plaintiffs' Class of homeowners who were, and most of whom continue to be, victimized by a predatory lending scheme maintained by Community Bank of Northern Virginia ("CBNV")(a Virginia state bank), Guaranty National Bank of Tallahassee ("GNBT")(a national bank)(collectively "the Banks"), and others.[1]

2.     The so-called "125" loans (also known as "high loan to value" or "HLTV" loans) made by CBNV/GNBT to Plaintiffs and Class Members resulted in combined first and second mortgage debt substantially *exceeding* each home's value such that the resulting lack of equity prevents a sale or refinancing — leaving each homeowner with the Hobson's choice of bankruptcy, losing their home or continuing exorbitant second mortgage payments.

3.     This action includes both a plaintiffs' and a defendants' class in connection with home mortgage loans made by the Banks.  Defendants include, in addition to CBNV, those defendants-assignees (including a Defendant Class) that purchased or had assigned to them, or their trustees, the Banks' mortgage loans — such defendants-assignees being absolutely liable as a matter of law for the Banks' violations of Plaintiffs' and Class Members' rights under the Truth-in-Lending Act ("TILA"), 1994 amendments to TILA known as the Home Ownership and Equity Protection Act ("HOEPA") and the Residential Settlement Procedures Act ("RESPA").

---

[1]  The Plaintiffs' Class is defined, *infra* at 46, ¶ 150.

4.     While CBNV has been named a party defendant by this First Amended Complaint, GNBT has not been named in this action because it was closed by the Office of the Comptroller of Currency ("OCC") on March 12, 2004, and the FDIC has been appointed as the Receiver over this failed institution.  Actions against the FDIC as GNBT receiver are presently stayed.  The OCC's news release regarding the closure of GNBT disclosed that "Problem areas included a high loan-to-value home equity lending program which the bank failed to properly oversee and which led to substantial losses [and] [t]he OCC found numerous violations of *consumer laws* in this lending program ....". (Emphasis added).

5.     Upon information and belief, the "lending program" described by the OCC is the very same lending program that is the subject of this action — a predatory lending scheme first fostered by CBNV and thereafter continued by CBNV and GNBT. The "consumer laws" violated consist principally of universal, across-the-class violations of the Truth-in-Lending Act ("TILA"), the Home Ownership and Equity Protection Act ("HOEPA") and the Real Estate Settlement Procedures Act ("RESPA").

## THE THIRD CIRCUIT APPEALS

6.     None of the Plaintiffs or proposed Class Members *presently* include members of the certified class and/or persons bound by an injunction issued as part of the Judgment entered in a "sweetheart" class action settlement engineered by GMAC-RFC and corrupt class counsel in *In re Community Bank of Northern Virginia and Guaranty National Bank Second Mortgage Loan Litigation*, Case No. 03-0425, United States District Court for the Western District of Pennsylvania (the *"CBNV/GNBT Class Action"*) — a settlement presently challenged by the Plaintiffs' counsel in the below-referenced appeals now pending before the Third Circuit Court of Appeals. Briefing of these appeals will not be completed before November 1, 2004.

7.     Except for former CBNV/GNBT class members who *opted out* of the CBNV/GNBT Class Action settlement, all other members of the class in the *CBNT/GNBT Class Action* are excluded, *at this time*, from the Plaintiff Class in this action and those excluded members shall sometimes be referred to as the "CBNV/GNBT Excluded Class."

8.     As to the CBNV/GNBT Excluded Class there are thirteen separate appeals currently pending in the United States Court of Appeals for the Third Circuit (Appeal Nos. 03-4220, 03-4221, 03-4725, 03-4294, 03-4316, 03-4319, 03-4504, 03-4732, 03-4837, 03-4838, 03-4862, 04-1002, and 04-1039). All of these appeals consist of or relate to challenges to the class action settlement in the *CBNV/GNBT Class Action*.

9.     While a number of issues have been raised before the Third Circuit, of prime importance to this action are two of the appellants' arguments that seek to set aside the CBNV/GNBT Class Action settlement that covered approximately 44,000 borrowers having TILA, HOEPA and RESPA claims indistinguishable from those of Plaintiffs and Class Members in this First Amended Complaint.

10.     First, the District Court for the Western District of Pennsylvania found, before it improperly allowed amendments *adding* federal claims, that it lacked subject matter jurisdiction over the claims of the plaintiffs in a removed action captioned as *Kessler, et al. v. GMAC-Residential Funding Corporation. Kessler* was designated the lead case among a number of separate putative class actions that were individually closed and consolidated into the *CBNV/GNBT Class 'Action* with the *Kessler* action as the lead case in which a national class was certified consisting of all CBNV/GNBT HOEPA loans purchased by GMAC. If the Third Circuit finds that the district court lacked subject matter jurisdiction, all proceedings in the *CBNV/GBNT Class Action*, including the class settlement, become void as matter of law.

11. Second, appellants challenge the CBNV/GNBT Class Action settlement on grounds that it must be reversed because it is not fair, adequate or reasonable. The settlement, presenting a classic case of a class "sold down the river," extinguishes *at the very least a **billion*** dollars of predatory lending liability against GMAC-RFC in return for class settlement payments totaling a maximum of $33 million dollars. For accommodating GMAC-RFC, class counsel get $8.1 million in fees to in a case in which they neither required GMAC-RFC to file any responsive pleadings nor conducted one whit of formal discovery. If the Third Circuit reverses the settlement, then the CBNV/GNBT Excluded Class having approximately 44,000 members will be *saved* from the settlement and automatically become Class Members herein respecting claims *identical* to those already asserted by Plaintiffs and proposed Class Members.

12. Having touted certification of the CBNV/GNBT Excluded Class for "settlement" purposes, GMAC-RFC is judicially estopped to deny herein certification of the same class for "litigation" purposes. The sole basis for certification, that all borrowers obtained HOEPA-qualifying loans purchased by GMAC-RFC, still applies and makes the claims of the CBNV/GNBT Excluded Class indistinguishable from those of Plaintiffs and Class Members.

13. If the Third Circuit overturns and vacates the CBNV/GNBT Class Action Settlement under either of the above-stated grounds or other grounds in the above-referenced appeals, then the Plaintiff Class sought herein shall also include all those members of the CBNV/GNBT Excluded Class. In such an event, the Plaintiffs herein will amend, if and as necessary, the proposed Plaintiff Class definition set forth below to include all persons within the definition of the national class in the CBNV/GBNT Class Action. [2]

---

[2] Thus, as presently defined, the Plaintiff Class herein consists exclusively: (1) of Class Members' whose CBNV/GNBT originated loans were purchased by defendants *other than* GMAC (Hobson and Nixon): and (2) Class Members whose CBNV/GNBT originated loans were purchased by GMAC/RFC but who *opted out* of the CBNV/GNBT settlement (Kelly and Roberts).

## THE NATURE OF THE PREDATORY LENDING CLAIMS — AN OVERVIEW

13.      The claims for which the Defendants and the Defendant Class, as defined below, are liable arise under the Truth In Lending Act ("TILA") as amended by the Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C. §§ 1601 *et seq.*, the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.* at 12 U.S.C. § 2607 and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq. None* of these claims for relief were originally asserted in *Kessler,* yet the GMAC-RFC settlement proposed to release and extinguish all such claims.

### A.      The Banks' Bait and Switch Tactics

14.      Each of the Plaintiffs and members of the Plaintiff Class were lured into their loans by a classic "bait and switch" operation that principally used mailed flyers (exemplars attached) to entice Plaintiffs and Class Members to apply for facially competitive second mortgage loans. (CBNV Flyer, Exhibit 1: GNBT Flyer, Exhibit 2). The flyers, however, did not disclose the high closing fees that would be charged (typically 12 % to 20 % or more of the "total loan amount)[3] or the resulting sky-high annual percentage rates ("APR") that would be charged.[4] Further, as explained in detail below, the HUD-1 settlement statements and other loan documents concealed from the Plaintiffs and members of the Plaintiff Class that the Banks were not the true recipients of the fees and costs thereby causing the Plaintiffs and members of the Plaintiff Class to wrongly believe that such costs were reasonable and bona fide.

### B.      Concerted Concealment of Federally Mandated Disclosures

16.      Through the deliberate withholding and concealment of required federal lending

---

[3]    **Closing Fee Percentages** – (Hobson, 13 %; Kelly, 16.5 %; Nixon, 13 %: and Roberts, 19 %).
[4]    **Annual Percentage Rates** – (Hobson, 19.9 %; Kelly, 16.5 %; Nixon, 20.3 %; Roberts, 17.8 %).).

disclosures, the Plaintiffs and Plaintiff Class were intentionally deprived of the true terms and cost of the loans for which they applied, as well as the Banks' nefarious intentions. Plaintiffs and all Class Members closed HOEPA mortgage loans that *facially appeared* to have been originated by CBNV or GNBT through their collection of origination fees under Section 800 of the Plaintiffs' and Class Members' HUD-1 Settlement Statements. (Exhibits 3, 7, 11 & 14). Under Section 1100 of the same Settlement Statements the Banks concealed the fact that the title fees had not been charged by legitimate third parties and that the title-related fees charged had never been incurred at all and/or were neither bona fide nor reasonable. (*Id.*).

15.    The banks deliberately withheld and concealed RESPA-required "Good Faith Estimates of Settlement Costs" that must be provided to all borrowers within three business days of the borrowers' application as mandated by 12 U.S.C. § 2604(c) & (d). In order to *continue* the concealment of the outrageous settlement costs never disclosed in their mailed flyers, the Banks withheld all Plaintiffs' and Class Members' "Good Faith Estimates of Settlement Costs" until their inclusion with all other closing documents at *closing*. Such concealment and withholding effectively deprived the Plaintiffs and Class Members, as the Banks intended, of any ability to shop the Banks' credit terms against other lenders, thereby defeating entirely the avowed purposes of TILA, HOEPA and RESPA. The preambles to TILA and RESPA provide as follows:

(a) **Informed use of credit**

The Congress finds that economic stabilization would be enhanced and the *competition* among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the *informed* use of credit. The informed use of credit results from *an awareness of the cost thereof* by consumers. It is the purpose of this subchapter to assure a _meaningful disclo-sure of credit terms_ so that the consumer will be able to _compare_ more readily the various credit terms available to him and *avoid the __uninformed__ use of credit*, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.

15 U.S.C. § 1601(a)(emphasis added). Compliance with RESPA's requirement of providing a "Good Faith Estimate of Settlement Costs" within three business days of *application,* as

contrasted with the Banks' universal withholding ***until closing***, serves a similarly important purpose.

> (a) The Congress finds that significant reforms in the real state settlement process are needed to ***insure that consumers*** throughout the Nation are provided with ***greater and more timely information*** on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country. ....

> (b) It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result —
> (1) in ***more effective advance disclosure*** to home buyers and sellers of ***settlement costs***;
> (2) in the ***elimination of kickbacks or referral fees*** that tend to increase unnecessarily the costs of certain settlement services;
> (3) in a reduction in the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance; and ....

12 U.S.C. § 2601(a) & (b)(emphasis added). Given the remedial purposes of TILA, HOEPA and RESPA, and the liberal construction thereof mandated as a matter of law, it cannot be disputed that Congress intended consumers' presumptive reliance upon complete, accurate and timely disclosures under these statutes. Unbeknownst to Plaintiffs and Class Members every aspect of the Banks' lending practices represented the antithesis of Congress' extensive attempts to protect consumer borrowers.

**C.    TILA, HOEPA, RESPA and RICO Jurisdiction**

16.    Each of the Plaintiffs and the Plaintiff Class Members executed promissory notes and mortgage agreements in connection with their mortgage loans, which transactions were consumer credit transactions within the meaning of TILA and HOEPA (15 U.S.C. § 1602 and Regulation Z § 226.2). The loans were obtained primarily for personal, family, or household purposes, and the mortgages were all secured by the Plaintiffs' and the Plaintiff Class Members' respective principal dwellings. None of the Plaintiffs' and Class Members' loans were for business, commercial or agricultural purposes. 12 U.S.C. § 2606. The fraudulent scheme was

perpetrated upon Plaintiffs and all Class Members through the continuous use of the U.S. Postal

Service, interstate couriers and interstate wires. 18 U.S.C. §§ 1962 and 1964.

**D.**     **HOEPA's Three-Day-Before-Closing Disclosure Requirement**

17.     HOEPA does not impose any cap upon the amount of closing costs or interest

rates on such loans. Instead, HOEPA imposes special **pre-closing** disclosure requirements if the

loan meets one of two alternative HOEPA "triggers:" (1) an interest rate more than 10 basis

points ***greater than*** the historical treasury rate for the 15th of the month **preceeding** each loan's

application month (Federal Reserve Board H-15 Tables) for treasury bonds of similar maturity

(i.e., look at 20-year historical bond rates for 20-year loans); or (2) closing fees ***greater than*** 8 %

of the "total loan amount." (15 U.S.C.§ 1602(aa)).

18.     Each Plaintiffs' and Class Members' loan is a "high-cost/high interest" or

"HOEPA" loan as specified under the qualification "triggers" at 15 U.S.C. § 1602(aa) and

Regulation Z, at 12 C.F.R. § 226.32, by virtue of having met either the annual percentage rate

("APR") trigger, or the fee and cost trigger, or both. Likewise, ***all*** the approximately 44,000

loans subject to GMAC-RFC's settlement in the *GBNV/GBNT Class Action* satisfied, for class

definition purposes, the HOEPA triggers set forth at 15 U.S.C. § 1602(aa).

**THE BANKS' AND SHUMWAY/BAPST "RENT-A-BANK-CHARTER" SCHEME**

19.     The Plaintiffs' and all Class Members claims arise from the use of CBNV and

GNBT as straw fronts in a "rent-a-bank-charter," predatory lending scheme that, among other

things, involved victimizing borrowers through charging them enormous loan origination and

title charges — fees that were purportedly paid to third party non-affiliates (Regulation Z, 12

C.F.R. § 226.4(a)(1) & (2)) and fees that were neither reasonable nor bona fide. (Reg. Z at

226.4(c)(7)).

20.     The predatory lending scheme was the brainchild of the Shumway brothers (David, DeVan and Chris) and Randy Bapst (collectively the "Shumway Organization") done, initially, through their companies, Equity Plus LLC and Equity Plus Financial Inc. (hereinafter "Equity Plus") and also through its successor, Equity Guaranty LLC ("Equity Guaranty"). These entities and other affiliated companies, including Title America LLC, USA Title LLC, Resource Title, and/or Paramount Title, were used as part of an elaborate scheme to make predatory HOEPA mortgage loans nationwide by preying upon debt laden homeowners who nevertheless possessed excellent credit.[5]   Plaintiffs' and Class Members' lack of financial sophistication, exacerbated by the Banks' calculated concealment of critical federal disclosures and misleading loan documentation, made the Plaintiffs and Class Members perfect targets for predatory lending.

21.     The plan included using at first CBNV, and later GNBT also, as "fronts" for a lending enterprise operated by Equity Plus as to CBNV and then Equity Guaranty as to GNBT, and their related entities and in conjunction with use of the Banks' charters to "make" such loans. This use of the Banks as fronts was specifically concocted to utilize federal banking law pre-emption doctrines to insulate the Shumway Organization or its affiliated entities from liability under state consumer protection or fair lending laws.

22.     In connection with such scheme, the illegitimate loan origination fees, title charges, and various other fees were neither reasonable nor bona fide in the sense that they were charges for services never rendered or charges never incurred by the Banks.  Such fees and charges were also not paid to true third parties or to CBNV or GNBT.

---

[5]     To qualify for purchase by GMAC-RFC under its so-called "125" loan program, borrowers had to have a F.I.C.O. score of at least 640, which constitutes A minus credit in industry parlance. Pre-qualification of borrowers for mailing flyers and qualification at the time of telephone applications used interstate wires to contact credit bureaus and simultaneously take borrowers' telephone applications.

23.     In truth, the "origination fees," "loan discount fees," title charges and other charges at issue are not interest but were in fact and in nature finders fees and kickbacks shared only nominally by the Banks notwithstanding the representations contained in the loan closing papers.  Instead, most of such fees were illegally paid to the Shumway Organization or its affiliated entities, Equity Plus Financial, LLC (CBNV loans) or Equity Guaranty LLC (GNBT loans) and other affiliates thereof.  Such other affiliates included Title America LLC, USA Title LLC, Resource Title and/or Paramount Title whose true ownership was concealed from the Plaintiffs and the Plaintiff Class thereby making the payments to them appear to be legitimate origination and bona fide title costs but which, in fact, were simply additional kickbacks and illegal charges used solely for "loan padding" and unrelated to any legitimate service provided.

24.     Plaintiffs and the Plaintiff Class do not state any claims for "usury" under state or federal law and expressly disclaim any such claims as part of this lawsuit.

25.     The mortgage loans of the Class members violated TILA, HOEPA, RESPA and the overall fraudulent scheme executed by the Banks, the Shumway Organization and their affiliates through mail fraud (including interstate courier services) and wire fraud violated the Racketeer Influenced and Corrupt Organizations Act as alleged *infra* at pp. 63-68, ¶¶ 214-240.

26.     Pending completion of discovery the specific *lending law* violations include, *inter alia*, the following violations:

(a).     *Violations of TILA and HOEPA for Inaccurate Disclosures.*

(i)     As alleged more fully below, the predatory lending scheme violated TILA and HOEPA because the Banks made inaccurate disclosures, through material understatement of the Finance Charges and the APR on the Plaintiffs' loans.  When calculating the borrowers' Finance Charges, Amount Financed and the APRs for the purpose of making the TILA and HOEPA-required

– 10 –

disclosures, the Banks were only allowed to *exclude* from their calculations of the finance charges certain settlement charges that were "bona fide" and "reasonable" in amount as contemplated by TILA and HOEPA.

(ii)     Under the predatory lending scheme, as directed by the Shumway Organization and their affiliated companies, including primarily Equity Plus and Equity Guaranty, certain settlement charges were wrongfully excluded from the calculation of the Finance Charge, Amount Financed and APR. Consequentially, the Finance Charges, Amount Financed and the APRs disclosed to the Plaintiff borrowers were materially inaccurate and therefore in violation of TILA and HOEPA at 15 U.S.C. §§ 1605(f), 1606(c), 1639, 1640 and HOEPA's implementing regulations, Regulation Z, at 12 C.F.R. §§ 226.22, 226.23. Such violations give rise to actions for damages and rescission of the loans under HOEPA and Regulation Z.   Because the loans' closing documents withheld required disclosures, those loans also violated TILA and HOEPA and also give rise to actions for damages and rescission of the loans under HOEPA and Regulation Z.

(b).     *Violations of TILA and HOEPA for Untimely HOEPA Notices.*

(i)     The HOEPA-required, three *business* day, advance disclosures, including statutorily prescribed warnings as to the nature of these mortgages in terms of the potential for borrowers losing their home and all of their equity (15 U.S.C. § 1639(a)(1)), particularly require the *additional* disclosure of the true APR and the monthly payments for the loan. (15 U.S.C. § 1639(a)(2))(hereinafter the "HOEPA Notice"). The HOEPA Notice must be delivered to the borrower at least three *business* days *in advance of the actual*

*date of loan closing.* (15 U.S.C. § 1639(b)(1)). Any creditor's failure to comply with this HOEPA requirement constitutes a HOEPA violation for which the creditor and all Assignee-Defendants such as GMAC-RFC are jointly and severally liable. (15 U.S.C. § 1641).

(ii)     CBNV/GNBT typically withheld the HOEPA Notices such that the Plaintiffs and Class Members generally first saw such notices when they arrived by Fed Ex, or with a private courier, or when they walked into a closing lawyer's offices for their closing. In the case of Fed Ex closings, two sets of closing documents, including the HOEPA Notice, were delivered with instructions that the closing documents must be executed within 24 hours and returned via an enclosed prepaid, pre-addressed Fed Ex return envelope. Compliance with the 24 hour instruction necessarily meant that the 3 business day notice requirement was violated.

(iii)    As to closings with a private couriers or in lawyers' offices, Plaintiffs and Class Members invariably first saw their HOEPA Notices when they sat down to execute their closing documents, thereby having been deprived of any advance HOEPA Notice whatsoever before actual closing of their loan. Such withholding and untimely delivery of the HOEPA Notice constitutes a separate violation for which the Banks and assignees/purchasers are jointly and severally liable.

(c).    *Violations of HOEPA by Using Inconspicuous Type Sizes in Disclosures*

As to most of the HOEPA Notices to which plaintiffs' counsel have had access the Banks' HOEPA Notices contained an additional violation in that the warnings, APR and monthly payment disclosures were printed in a non-bold, non-capital, type size

– 12 –

*smaller than* the other type in the notice, thereby violating HOEPA's requirement that the required warnings, APR and monthly payment disclosures in the HOEPA Notice be printed "in conspicuous type size." (15 U.S.C. § 1639(a); 12 CFR 226.32 (c)). Such practice constitutes yet another separate violation of HOEPA's express statutory requirements for which the Banks and Defendant-Assignees are jointly and severally liable.

### (d).   *Falsification of HOEPA Notices' Acknowledgement of Date of Receipt.*

The Banks always included in their HOEPA Notices a line immediately above the borrowers' signature lines that typically and falsely required the borrower to acknowledge having received the HOEPA Notice either 3 days before closing or 72 hours before closing, when the Banks knew to a certainty that such was not the case. Such a falsification of the HOEPA Notices' receipt acknowledgement constitutes a separate HOEPA violation in that it falsely represents compliance with the 3-business-day advance delivery requirement of 15 U.S.C. § 1639(b)(1). Addition of any false information beyond the required disclosures of 15 U.S.C. § 1639(a)(1) & (2) constitutes a separate HOEPA violation for which the Banks and their Defendant-Assignees are jointly and severally liable.

### (e).   **Facial Invalidity of HOEPA Notices' Acknowledgments of Receipt**

Wholly apart from their false acknowledgement of receipt, many such acknowledgements are deficient on their face in that they acknowledge receipt: (1) without stating any period at all of purported pre-closing notice, or (2) merely attest delivery "3 days" or "72 hours" before closing without acknowledging receipt "3 **business** days prior" to closing. 15 U.S.C. § 1639(b)(1). Such deficient acknowledgements raise a presumption of non-compliance and constitute yet another

separate violation of HOEPA for which the Banks and their Defendant-Assignees are jointly and severally liable.

### (f). *Violating HOEPA by Omitting from Notes HOEPA's Bar to Collection of Prepayment Penalties in Refinancings.*

Most of the promissory notes of Plaintiffs and Class Members contained an additional and separate HOEPA violation respecting HOEPA's restriction on the collection of prepayment in refinancings by original lenders. Specifically, most of the note forms utilized by CBNV and GNBT contain provisions providing for prepayment penalties but *do not* disclose the HOEPA restriction that a prepayment penalty may be collected "if ... (B) the penalty applies only to a prepayment made with amounts obtained by the consumer by means *other than* a refinancing by the creditor under the mortgage, or an affiliate of that creditor." (15 U.S.C. § 1639(c)(2)(B)). The lack of such disclosure constitutes an additional and separate violation of HOEPA for which the Banks and their Defendant-Assignees are jointly and severally liable.

### (g). *RESPA Violations for Illegal Kickbacks and Fee-Splits.*

(i)    The Banks and the Shumway Operation violated RESPA's anti-kickback and fee-splitting provisions at 12 U.S.C. § 2607 because fees were given to and accepted by the Shumway Organization and its related entities for the referral of the Class members to the Banks and because charges were given to and accepted by and split by the Shumway Organization and its related entities for title services that recipients of such charges did not perform.  Further, the RESPA violations, like the other violations, were concealed from the borrowers by the Banks and the Shumway Organization and their related entities by concealing the identities of the actual recipients of the settlement charges and fees, concealing the amounts paid to such entities, and concealing the nature

– 14 –

of the ownership and control of the entities receiving the unlawful kickbacks and fee-splits.

        **(ii)**     The Banks, along with the Shumway Organization, Equity Plus, Equity Guaranty, and their affiliated companies, with the knowledge and consent of the remaining Defendants, used the HUD-1 or HUD-1A Settlement Statements (hereinafter "HUD-1s") to conceal unlawful kickbacks and referral fees being paid to the Shumway Organization, Equity Plus and Equity Guaranty on the HOEPA mortgage loans. The section 800 charges listed on the HUD-1s uniformly misrepresented that origination and loan discount fees were being paid to the Banks when, in fact, said fees were being paid almost entirely to the Shumway Organization, Equity Plus and Equity Guaranty and the Banks were receiving only a small portion of those fees. The section 1100 charges listed on the HUD-1s, in violation of RESPA at 12 U.S.C. § 2607, and RESPA's implementing regulations, Regulation X, at 24 C.F.R. § 3500.14, were imposed for purported services by undisclosed affiliates of the creditors that were not bona fide, not rendered, or for nominal or duplicative services for which no fees were earned and for which no fees should have been imposed.

        **(iii)**     Further, by virtue of the "rent-a-bank-charter" scheme, the Banks' and Equity Plus' and Equity Guaranty's undisclosed "affiliated business arrangements" with their controlled title companies, USA Title, Title America, Resource Title, and Paramount Title, were nothing more than "sham arrangements" used as a subterfuge for padding closing fees and for passing referral fees back to Equity Plus, Equity Guaranty, the Shumway Organization and others, all in violation of RESPA at 12 U.S.C. § 2607, and Regulation X, at 24 C.F.R. § 3500.15. The borrowers were required to use the title

– 15 –

companies and then, pursuant to the predatory lending scheme, the title-related charges were passed on to Equity Plus, Equity Guaranty, the Shumway Organization and others.

27.     The Defendants and the Defendant Class who received such loans by assignment of such loans are liable to the Plaintiffs and the Plaintiff Class for the Banks' above-stated violations of federal law just as the Banks are liable to the Plaintiffs, pursuant to HOEPA, at 15 U.S.C. § 1641(d)("Liability of Assignees").

## THE PARTIES, JURISDICTION AND VENUE

### The Plaintiffs

28.     At all times relevant hereto, Plaintiff Clell L. Hobson resided at 3705 Dearing Down Drive, Tuscaloosa, Alabama 35405, within the Western Division of this Honorable Court. His 20-year, $55,500 CBNV loan, from which $6,660.85 in settlement charges were withheld and paid at closing, closed on May 2, 2001, with a *disclosed* APR of 19.904 %.  Mr. Hobson's loan, which was assigned to Defendant Irwin Union Bank & Trust Company, qualifies as a HOEPA loan under 15 U.S.C. § 1602(aa).

29.     Plaintiff Rosa Kelly, a Captain in the United States Army, who timely opted out of the CBNV/GNBT Class Action Settlement, resides at 3736 Patti Parkway, Decatur, Georgia 30334.  Her 25-year, $51,600 GNBT loan, from which $7,376.50 in settlement charges were withheld and paid at closing, closed on September 27, 2000, with a *disclosed* APR of 16.532 %. Captain Kelly's loan, which was assigned to Defendant GMAC-Residential Funding Corporation, qualifies as a HOEPA loan under 15 U.S.C. § 1602(aa).

30.     Plaintiff John A. Nixon Jr., resides at 6701 Hibiscus Lane, Northport, Alabama 35473-1864, within the Western Division of this Honorable Court. His 25-year, $49,999 CBNV loan, from which $5,983.91 in settlement charges were withheld and paid at closing, closed on February 8, 2001, with a *disclosed* APR of 20.261 %.  Reverend Nixon's loan, which was

– 16 –

assigned to Defendant Irwin Union Bank & Trust Company, qualifies as a HOEPA loan under 15 U.S.C. § 1602(aa).

33.     Mr. and Mrs. Jerome Roberts, who timely opted out of the CBNV/GNBT Class Action Settlement, reside at 415 Suwanee East Drive, Lawrenceville, Georgia 30043. Their 25-year, $39,000 GNBT loan, from which $6,343 in settlement charges were withheld and paid at closing, closed on October 13, 2000, with a *disclosed* APR of 17.828 %. The Roberts' loan, which was assigned to Defendant GMAC-Residential Funding Corporation, qualifies as a HOEPA loan under 15 U.S.C. § 1602(aa).

34.     Each of the Plaintiffs, therefore, is a member of the Plaintiff Class as defined, at 45, ¶ 150.

**The Defendants**

35.     Defendant IRWIN UNION BANK AND TRUST COMPANY ("Irwin") is an Indiana corporation with its principal place of business in either California or Indiana and which does business in Alabama and which has purchased certain HOEPA loans of the Plaintiff Class directly or indirectly from the Banks and as such stands in the shoes of the Banks under 15 U.S.C. § 1641, which Banks also did business in Alabama as to the particular loans that were made in Alabama, and Irwin can be served with legal process by serving the President or Officer in Charge or Matthew F. Souze, 500 Washington St., Columbus, Indiana 47201.

36.     Irwin is liable to Plaintiffs Hobson and Nixon and the Plaintiff Class for the violations of TILA, HOEPA, RESPA and RICO just as CBNV and GNBT are liable to Plaintiffs and the members of the Class pursuant to HOEPA, 15 U.S.C. § 1641(d), and under common law rules of assignee liability. Since Plaintiffs can undeniably assert their claims against CBNV and GNBT, both individually and on behalf of each and every similarly aggrieved Class Member, Irwin Union Bank and Trust Company is a proper party to this lawsuit.

– 17 –

37.     Defendant HOUSEHOLD FINANCE, INC. ("Household") is a Delaware corporation with its principal place of business in Illinois and which does business in Alabama and which has purchased certain HOEPA loans of the Plaintiff Class directly or indirectly from the Banks and as such stands in the shoes of the Banks under 15 U.S.C. § 1641, which Banks also did business in Alabama as to the particular loans that were made in Alabama, and Household can be served with legal process by serving The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

38.     Household is liable to the Plaintiff Class for the violations of TILA, HOEPA, RESPA and RICO just as CBNV and GNBT are liable to Plaintiffs and the members of the Class pursuant to HOEPA, 15 U.S.C. § 1641(d), and under common law rules of assignee liability. Since Plaintiffs can undeniably assert their claims against CBNV and GNBT, both individually and on behalf of each and every similarly aggrieved Class Member, Household is a proper party to this lawsuit.

39.     Defendant WILSHIRE FUNDING CORPORATION ("Wilshire") is a Delaware corporation having its principal of business in California and which is licensed to and does business in Alabama and which has purchased certain HOEPA loans of the Plaintiff Class directly or indirectly from the Banks and as such stands in the shoes of the Banks under 15 U.S.C. § 1641(d), which Banks also did business in Alabama as to the particular loans that were made in Alabama, and Wilshire can be served with legal process by serving CSC Lawyers Incorporating Service, Inc., 150 S. Perry St., Montgomery, Alabama 36104.

40.     Wilshire is liable to the Plaintiff Class for the violations of TILA, HOEPA, RESPA and RICO just as CBNV and GNBT are liable to Plaintiffs and the members of the Plaintiff Class pursuant to HOEPA, 15 U.S.C. § 1641(d), and under common law rules of assignee liability. Since Plaintiffs can undeniably assert their claims against CBNV and GNBT,

both individually and on behalf of each and every similarly aggrieved Class Member, Household is a proper party to this lawsuit.

41.    Defendant GMAC-RESIDENTIAL FUNDING CORPORATION (sometimes referred to above and below as "GMAC-RFC") is a Delaware corporation with its principal place of business in Minnesota and is a 100% subsidiary of GMAC-RFC Holding Corporation. GMAC-RFC is licensed to and does business in Alabama and has purchased the Kelly and Roberts loans and certain other HOEPA loans of the Plaintiff Class (excluding the CBNV/GNBT Excluded Class) directly or indirectly from the Banks and as such stands in the shoes of the Banks under 15 U.S.C. § 1641(d), which Banks also did business in Alabama as to loans that were made in Alabama. RFC can be served with process by serving The Corporation Company, 2000 Interstate Park, Suite 204, Montgomery, Alabama 36109.

42.    GMAC-Residential Funding Corporation is liable to Plaintiffs Kelly and Roberts, and the Plaintiff Class for the violations of TILA, HOEPA, RESPA and RICO just as CBNV and GNBT are liable to Plaintiffs and the members of the Class pursuant to HOEPA, 15 U.S.C. § 1641(d), and under common law rules of assignee liability. Since Plaintiffs and the members of the proposed Class can undeniably assert their claims against CBNV and GNBT, both individually and on behalf of each and every other member of the proposed Class, GMAC-Residential Funding Corporation is a proper party to this lawsuit.

43.    JP MORGAN CHASE BANK, f/k/a THE CHASE MANHATTAN BANK (sometimes "Morgan-Chase") is a New York corporation with its principal place of business in New York and which does business in Alabama and which, as trustee for certain GMAC-RFC created trusts, the specific identity of which is unknown at this time, has been assigned certain of the HOEPA loans of the Plaintiff Class, directly or indirectly, from the Banks and as such, Morgan-Chase and its trusts stand in the shoes of the Banks under 15 U.S.C. § 1641(d), which

– 19 –

Banks also did business in Alabama as to the particular loans that were made in Alabama. JP Morgan-Chase can be served with legal process by serving the President or Managing Agent at 4 New York Plaza, 13th Floor, New York, NY 10004.

44.    Morgan-Chase is liable in its representative capacity and on behalf of the trusts for which it is trustee to the Plaintiffs and the Plaintiff Class for the violations of TILA, HOEPA, RESPA and RICO just as CBNV and GNBT are liable to Plaintiffs and the members of the Class pursuant to HOEPA, 15 U.S.C. § 1641(d), and under common law rules of assignee liability. Since Plaintiffs and the members of the proposed Class can undeniably assert their claims against CBNV and GNBT, both individually and on behalf of each and every other member of the proposed Class, Morgan-Chase is a proper party to this lawsuit.

45.    FAIRBANKS CAPITAL CORPORATION (sometimes "Fairbanks") is a Utah corporation with its principal place of business in Salt Lake City, Utah and which does business in Alabama and which has purchased certain HOEPA loans of the Plaintiff Class directly or indirectly from the Banks, and as such stands in the shoes of the Banks under 15 U.S.C. § 1641(d), which Banks also did business in Alabama as to the particular loans that were made in Alabama. Fairbanks can be served with legal process by serving Thomas D. Basmajian, CEO, or his successor or other officer in charge, at 3815 West Temple, Salt Lake City, Utah  84115.

46.    Fairbanks is liable to the Plaintiff Class for the violations of TILA, HOEPA, RESPA and RICO just as CBNV and GNBT are liable to Plaintiffs and the members of the Class pursuant to HOEPA, 15 U.S.C. § 1641(d), and under common law rules of assignee liability. Since Plaintiffs and the members of the proposed Class can undeniably assert their claims against CBNV and GNBT, both individually and on behalf of each and every other member of the proposed Class, Fairbanks is a proper party to this lawsuit.

47.     CONSECO, INC., (sometimes "Conseco") is an Indiana corporation with its principal place of business in Carmel, Indiana and which does business in Alabama and which has purchased certain HOEPA loans of the Plaintiff Class directly or indirectly from the Banks and as such stands in the shoes of the Banks under 15 U.S.C. § 1641(d), which Banks also did business in Alabama as to the particular loans that were made in Alabama. Conseco can be served with legal process by serving John R. Kline, Senior Vice President, or his successor or other officer in charge, at 11825 North Pennsylvania, Carmel, Indiana 46032.

48.     Conseco is liable to the Plaintiff Class for the violations of TILA, HOEPA, RESPA and RICO just as CBNV and GNBT are liable to Plaintiffs and the members of the Class pursuant to HOEPA, 15 U.S.C. § 1641(d), and under common law rules of assignee liability. Since Plaintiffs and the members of the proposed Class can undeniably assert their claims against CBNV and GNBT, both individually and on behalf of each and every other member of the proposed Class, Conseco is a proper party to this lawsuit.

49.     MOREQUITY, INC., (sometimes "Morequity") is a Delaware corporation with its principal place of business in Indiana and which does business in Alabama and which has purchased certain HOEPA loans of the Plaintiff Class directly or indirectly from the Banks and as such stands in the shoes of the Banks under 15 U.S.C. § 1641(d), which Banks also did business in Alabama as to the particular loans that were made in Alabama. Morequity can be served with legal process by serving CSC Lawyers Incorporating Service, Inc., 150 South Perry Street, Montgomery, Alabama 36104.

50.     Morequity is liable to the Plaintiffs and the Plaintiff Class for the violations of TILA, HOEPA, RESPA and RICO just as CBNV and GNBT are liable to Plaintiffs and the members of the Class pursuant to HOEPA, 15 U.S.C. § 1641(d), and under common law rules of assignee liability. Since Plaintiffs and the members of the proposed Class can undeniably assert

their claims against CBNV and GNBT, both individually and on behalf of each and every other member of the proposed Class, Morequity is a proper party to this lawsuit.

51.    The Defendants identified in paragraphs 34 through 49 above are all entities that took an assignment of or otherwise acquired from the originating lenders, ostensibly either CBNV or GNBT, and then held or still hold the loans of Plaintiffs or members of the Plaintiff Class, or who act as trustees for such downstream holders and such Defendants are sometimes hereinafter referred to as the "Assignee-Defendants."

52.    COMMUNITY BANK OF NORTHERN VIRGINIA ("CBNV") is a Virginia corporation with its principal place of business in Virginia and which does business in Alabama and which as a lender and a front for the aforementioned predatory lending scheme made numerous HOEPA loan to certain of the Plaintiffs and to members of the Plaintiff Class. CBNV can be served with legal process by serving David P. Summers, or his successor, as President and CEO, 8150 Leesburg Pike, Vienna, Virginia 22182.

53.    The Defendants also include members of a Defendant Class as more specifically alleged below and which Defendants do business in Alabama and which Defendants purchased certain HOEPA loans of the Plaintiff Class directly or indirectly from the Banks and as such stand in the shoes of the Banks under 15 U.S.C. § 1641, which Banks also did business in Alabama as to the particular loans that were made in Alabama.

54.    Those Defendant Class members are liable to the Plaintiffs and the Plaintiff Class for the violations of TILA, HOEPA, RESPA and RICO just as CBNV and GNBT are liable to Plaintiffs and the members of the Plaintiff Class pursuant to HOEPA, 15 U.S.C. § 1641(d), and under common law rules of assignee liability. Since Plaintiffs and the members of the proposed Plaintiff Class can undeniably assert their claims against CBNV and GNBT, both individually and

on behalf of each and every other member of the proposed Class, the members of the Defendant Class are proper parties to this lawsuit.

### Jurisdiction and Venue

55.     Federal question jurisdiction is proper under 28 U.S.C. § 1331, 12 U.S.C. § 2614, 18 U.S.C. § 1964, and 15 U.S.C. § 1640(e) as the federal claims asserted arise under federal law.

56.     Venue and personal jurisdiction are proper in this Court pursuant to recognized principles of due process and in accordance with 28 U.S.C. § 1391 and 18 U.S.C. § 1965.

57.     Defendants are subject to the specific jurisdiction of this Court because they, either directly or indirectly, have purposefully directed their activities towards Alabama residents and because the Plaintiffs' causes of action arise out of and relate to the Defendants' activities, in part, within this judicial district and the State of Alabama.

58.     Additionally, Defendants are subject to the general jurisdiction of this Court because they have substantial, continuous, and systematic contacts with the State of Alabama. By virtue of the "rent-a-bank-charter" scheme and conspiracy, CBNV and GNBT made and the remaining Defendants and members of the Defendant Class acquired thousands of loans, including hundreds of loans in Alabama, from CBNV and GNBT. The remaining Defendants and the members of the Defendant Class have thus, in essence, funded and/or purchased HOEPA mortgage loans made to Alabama borrowers, and have liens on real property in Alabama (which was used as collateral for HOEPA mortgage loans) and the power of the Alabama courts to enforce those liens, which they have undoubtedly done in the past.

59.     Each of these Alabama Plaintiffs and the Alabama Plaintiff Class Members, make monthly payments on their HOEPA mortgage loans, and Defendants continue to profit directly or indirectly from the revenue stream generated by the thousands of HOEPA mortgage loans that they own.  Simply put, Defendants are or were in the business of funding and purchasing

HOEPA mortgage loans, and such activities are central to the conduct of their business, and their funding and servicing of Alabama mortgage loans is substantial and continuous.

60.    The contacts of the Defendants and those of the Defendant Class with Alabama are sufficient, substantial and continuous, and the Plaintiffs' causes of action arise from and relate to those contacts so that the maintenance of the suit in this Court does not offend traditional notions of fair play and substantial justice.  Defendants and the Defendant Class should reasonably anticipate being haled into this Court in this judicial district in Alabama to answer for the unlawful acts of the Banks and their own unlawful acts, especially since Alabama has a strong interest in providing a forum for its residents aggrieved by schemes to violate consumer protection acts and fair lending laws.

61.    Indeed, Plaintiffs' and Class Members' mortgage instruments expressly provide that "[t]he state and local laws applicable to this [mortgage] shall be the laws of the jurisdiction in which the property is located. The foregoing sentence shall not limit the applicability of Federal law to this [mortgage]."  Moreover, these loans which were purchased by the Defendants and the Defendant Class were purchased with notice that these loans were HOEPA loans and that the Defendants and Defendant Class stood in the shoes of the Banks with respect to liability for such loans.

62.    Venue is proper in this Court because the Alabama Plaintiffs reside in this judicial district and additionally, because Defendants and the Defendant Class "reside" in this district by virtue of it being subject to personal jurisdiction in this judicial district, because they regularly solicited and did business and transacted their affairs in this judicial district and hold or held interests in real property in this judicial district, and because a substantial part of the events giving rise to the Plaintiffs' claims occurred in this judicial district. Venue in this district and

nationwide service of process from this district is further available under the RICO venue and process provisions of 18 U.S.C. § 1965.

## FACTUAL BACKGROUND

### The Predatory and Fraudulent Lending Scheme in Greater Detail

63.     The Plaintiffs and the members of the Plaintiff Class were the victims of a predatory lending scheme created to charge and collect from Plaintiffs and the Plaintiff Class bogus, excessive and illegal fees and charges on their loans, together with charging high interest rates, all as part of a scheme to make high-cost loans to borrowers across the country, including borrowers in the State of Alabama.   Such bogus and illegal fees were represented to be origination fees, loan discount fees or other charges and fees paid to CBNV or GNBT and title charges and fees to be paid to third-party title companies.   Instead, these bogus fees and charges were being paid directly or indirectly, in whole or in substantial part, to the promoters and organizers of this scheme and artifice, the Shumway Organization and their affiliated entities, including primarily, Equity Plus and/or Equity Guaranty or their other affiliated entities, in an effort to avoid consumer protection laws and regulation of Defendants' lending practices.

64.     In particular, Equity Plus and its controlling owners began in early 1998 a massive mortgage operation that included their use in a false and fraudulent manner state-chartered or national banks to make high-cost home equity mortgage loans across the United States.

65.     The Shumway Organization used Equity Plus and Equity Guaranty and affiliated entities, together with multiple business forms, to aggressively solicit residential home equity mortgages through a massive national direct mail marketing campaign.   The Shumways and Bapst served as officers and directors of Equity Plus and Equity Guaranty.

66.     This business scheme, however, had a unique twist. Instead of pursuing these loans through entities that were owned or controlled by the owners of Equity Plus or Equity Guaranty or affiliated entities, they pursued such by what facially appeared to be state-chartered, federally insured or national banks (including the Banks), all part of an illegal "rent-a-bank-charter" scheme involving the charters of those state-chartered, federally insured or national banks, including the Banks.

67.     This scheme was intended to give the false appearance that the otherwise illegal charges and fees were paid to a state-chartered or national bank and that such would "wash" those charges and fees from what would otherwise be and were, in any event, violations of various consumer protection laws.

68.     CBNV was first used as one of the Banks in early 1998 by the Shumway Organization with Equity Plus and/or its affiliated predecessors or affiliated entities, including Title America, USA Title LLC, Resource Title, and Paramount Title to make HOEPA mortgage loans, which loans include the loans to the Hobson and Nixon Plaintiffs.

69.     CBNV's relationship with the Shumway Organization and Equity Plus, however, soured in late 1999 because CBNV sought additional compensation for its role in this scheme. Thus, in early 2000, the Shumway Organization latched onto GNBT, a fledgling bank, and a short time later began using Equity Guaranty and/or its affiliated entities, including Title America, USA Title LLC, Resource Title, and Paramount Title, to continue to promote and make HOEPA mortgage loans, which loans include the loans made to the Kelly and Roberts members of the Plaintiffs' Class.

70.     The Shumways and Bapst served as officers and directors of and/or controlled the operations of the title companies. The title companies were "sham" entities that were inadequately capitalized, had few if any employees, and did not compete in the marketplace for

business. As such, the Banks' representations to the Plaintiffs in the HUD-1s that certain fees and charges were paid to the title companies were in fact false and designed to conceal the true nature and recipient of such fees and charges, thereby misleading the Plaintiffs and members of the Plaintiff Class into believing that they were dealing with independent, or "true", third–party, bona fide title companies, who were ostensibly competing in the free marketplace for business, charging reasonable fees and not paying or kicking back such fees to others.

71.     The substantial operations for promoting and making these loans and conducting the title services were conducted in whole or substantial part **_not_** at the offices of CBNV or GNBT, but at Equity Plus and Equity Guaranty LLC's offices or the offices of affiliated entities, first at 11417 Sunset Hills, Reston, Virginia, 20190 and then at 4501 Singer Court, Chantilly, Virginia 20151, which expanded space was necessary to accommodate the vastly expanding mortgage business that was being conducted in the nominal name of the Banks, but in fact by the Shumway Organization and Equity Plus and Equity Guaranty and their affiliated entities.

72.     As a result of the massive direct mail solicitation campaign that used lists that had been purchased from major credit reporting agencies, this mortgage business mushroomed. The solicitation campaign averaged millions of pieces of mail per month and included thousands and thousands of mailings nationwide that in turn resulted in the loans to the Plaintiffs. These solicitations falsely represented and misled the Plaintiffs to believe that they were dealing with "authorized agents" of the Banks and/or were divisions or lending programs of the Banks.

73.     These massive direct mailing costs and payroll costs of this lending operation were paid not by the Banks, but by the Shumway Organization through Equity Plus or Equity Guaranty or one of their affiliated entities.

74.     The Plaintiffs received the mail solicitations and called the "Banks'" toll-free telephone numbers to apply for their second mortgage loans. The toll-free numbers that Plaintiffs

– 27 –

called and were used by the "Banks" were in fact registered to the separate entities Equity Plus and Equity Guaranty.

75. The Plaintiffs' HUD-1s identified either of the Banks as their lenders, including GNBT whose only offices and branches were, in fact, in Florida and, in any event, were not in Virginia or Washington, D.C.

76. Notably, the Plaintiffs' HUD-1s also identified the "place of settlement" as either 11417 Sunset Hills, Reston, Virginia, 20190, or 4501 Singer Court, Chantilly, VA 20151, both of which were Equity Plus' and Equity Guaranty's business addresses, or at the address of one of their affiliated or associated title companies, such as "Paramount Title" in Washington, D.C.

77. Notwithstanding the HUD-1s showing that CBNV or GNBT were paid and received the origination, loan discount fees, and other Section 800 charges and fees charged to the Plaintiffs, those fees, which were paid at closing, were in fact paid directly or indirectly to Equity Plus or Equity Guaranty or the Shumway Organization or their affiliated entities, which facts were concealed from Plaintiffs.

78. Notwithstanding the HUD-1s showing that Title America, USA Title, Resource Title, or Paramount Title received the title charges set forth in Section 1100 of the Plaintiffs' HUD-1s, those fees, which were paid at closing, were in fact paid directly or indirectly to Equity Plus or Equity Guaranty, the Shumway Organization or others, all of which facts were concealed from Plaintiffs.

### Roles of Assignee-Defendants in the "Rent-a-Bank-Charter" Predatory Lending Scheme

79. The Assignee-Defendants and the Defendant Class were substantial purchasers of the HOEPA mortgage loans "generated" by the Banks and the Shumway Organization and Equity Plus or Equity Guaranty LLC or their affiliated entities.

80.    Like many purchasers of mortgage loans, the Assignee-Defendants and the Defendant Class profited by purchasing and holding mortgage loans in their own inventory that were obtained directly or through affiliates and correspondent lenders. Assignee-Defendants and the Defendant Class obtain the mortgage loans and then either hold them in their own inventory or consolidate the loans into securitized pools and sell, as securities, interests in the pools. "Securitization" or "securitizing" as used herein and as meant in general terms refers to the process of consolidating loans (including but not limited to residential mortgage loans) and/or packaging loans (not only mortgage loans) for sale as securities.

81.    Some of the most profitable loans that Assignee-Defendants and the Defendant Class could either hold or securitize through its affiliates or securitized trusts were high cost home equity mortgage loans, including those commonly referred to as "High Loan To Value" ("HLTV") loans.

82.    Thus the Assignee-Defendants and the Defendant Class turned to a number of originators of these high cost and often HLTV loans in order to generate substantial profits from either holding such loans in inventory or by securitizing such loans in securitization pools/trusts.

83.    The Shumway Organization, Equity Plus and Equity Guaranty and their affiliates, through their use of CBNV and GNBT became a substantial source of such high cost loans for the Assignee-Defendants and the Defendant Class..

84.    The Assignee-Defendants and the Defendant Class purchased all or substantially all of the HOEPA mortgage loans originated in the name of CBNV and GNBT. Having a guaranteed buyer of their HOEPA mortgage loan output, including RFC which purchased some 44,000 out of the Banks' loans, ensured the ability of the Shumway Organization, Equity Plus and Equity Guaranty and their affiliates to use CBNV and GNBT, and their limited reserves, to

fund thousands of HOEPA mortgage loans that otherwise could not be made or maintained by the Banks in their own portfolios.

85.     At the time they purchased the HOEPA mortgage loans, the Assignee-Defendants and the Defendant Class typically reviewed each loan file to determine whether the loan met their criteria for purchase and to determine how the loan was to be securitized.

86.     The Assignee-Defendants and the Defendant Class were consciously purchasing high cost HOEPA mortgage loans, and were cognizant of the "rent-a-bank-charter" predatory lending scheme.

87.     By providing the necessary funding and commitment to purchase substantially all of the loans generated by these fraudulent lending activities, the Assignee-Defendants and the Defendant Class could, in turn, expand their substantial profits from acquiring and/or securitizing these high cost loans.

88.     By securitizing the HOEPA mortgage loans, the Assignee-Defendants and the Defendant Class profited from the revenue stream generated by the borrowers' monthly payments on their HOEPA mortgage loans and the ultimate sale of mortgage-backed or asset-backed securities or notes issued by the securitized trusts that they formed for that purpose.

89.     In addition, by securitizing the loans, the Assignee-Defendants and the Defendant Class were able to issue securities that were rated by agencies such as Moody's, Fitch's and Standard & Poors. These ratings affected and were reflected in the price of the securities. In a general sense, the securities are basically classes of notes representing an interest share in the pools of loans, the purchasers of which anticipate a certain return on the notes based upon the ratings of the notes purchased. The ratings on the securities are based upon the fact that the trust pools hold high-cost HOEPA mortgage loans and take into account the likelihood of the borrowers making all payments on their HOEPA mortgage loans.

## Termination of the Fraudulent Predatory Lending Scheme

90.     On February 27, 2001, the Federal Deposit Insurance Corporation ("FDIC"), CBNV's federal regulator, prepared a "Community Reinvestment Act Performance Evaluation" of CBNV. In that evaluation, which was based, in part, upon a concurrent compliance examination of CBNV, the FDIC issued a "NEEDS TO IMPROVE" rating to CBNV based upon its "*laws violations of the fair lending and consumer protection and regulations.*" (Emphasis added). Although unknown at the time, these violations included violations of the loans made to the Plaintiffs and to the Plaintiff Class.

91.     The violations identified in the FDIC's compliance examination related to "irregularities in the marketing and administration of the bank's home equity loan program."

92.     The FDIC stated that when it opened in 1992, the bank had focused upon a "balanced portfolio of commercial, residential, and consumer loans." The FDIC found that CBNV's focus had changed: "since 1997, the bank has greatly increased its emphasis on the home equity market. As of evaluation date [February 2001], the home equity program conducted in the 4 loan production offices constituted the bank's major product line."

93.     CBNV's change in focus was due to its affiliation with, and agreement to rent its charter to, the Shumway Organization, Equity Plus, and their affiliated entities.

94.     The FDIC determined that CBNV typically "charges 10 points on each loan in addition to high underwriting, processing, and title fees. Due to the substantial amount of points and fees, these home equity loans are considered high cost transactions as defined in the Federal Reserve Board's Regulation Z, which is the implementing regulation for the Truth in Lending Act. The bank funds the approved loans under this program and immediately sells them to the secondary market investors within 1 to 3 days. The bank does not retain any home equity loans

originated under this program in its portfolio nor the servicing rights associated with these loans."

95.     This report did not become public and was not released by the FDIC until December 1, 2002 because CBNV challenged the FDIC's rating and the publication of the Report. CBNV, mindful of TILA's and RESPA's one year statutes of limitation, sought to conceal its misconduct from the public at large and from the Plaintiffs and Class Members in particular to hide behind the short limitations periods.

96.     In mid-2001, GNBT was audited by the Office of the Comptroller of Currency ("OCC").

97.     Because Equity Guaranty LLC and/or its affiliates had actually performed all or substantially all of the operations in promoting these loans, and in finding the borrowers and making these loans, GNBT was unable to provide the necessary information to comply with the OCC's audit requests.

98.     In January 2002, GNBT entered into an agreement with the OCC that placed a number of controls on the Bank to, in part, prevent the rent-a-bank-charter scheme outlined above.

99.     By early 2002, RFC curtailed and then ceased its substantial purchases of the GNBT/Guaranty Equity LLC high cost home equity loans and RFC actually returned, at least initially, a number of high cost home equity loans that it had previously purchased from GNBT/Equity Guaranty LLC or its affiliates.

100.     In a press release dated March 28, 2002, RFC announced that it was no longer willing to purchase high cost HOEPA loans. Its August 2002 "Broker/Lender Manual" restates RFC's unwillingness to purchase HOEPA Loans.  In its July 1, 2003, Client Guide, RFC elaborated on these restrictions and again stated that it will no longer purchase "high cost"

HOEPA mortgages. Ironically, but too late for some 46,000 plus CBNV/GNBT borrowers, the downside risk to GMAC-RFC of buying billions of dollars worth of non-compliant HOEPA mortgages finally became so great (approximately $3 billion) that GMAC-RFC, as a means of damage control and self-defense, lacking any altruism whatsoever, did what Congress had long ago intended and envisioned in passing HOEPA in 1994. Congress intended that the penalties of buying non-compliant HOEPA mortgages would be so draconian that assignees in the secondary market would in effect, "police the second mortgage industry" by refusing to buy loans violating HOEPA. Such refusals would be like depriving a tumor of its blood supply, thereby withering rogue mortgage operations like the Shumway/Bapst–CBNV/GNBT operation which had insufficient capital to survive without a revolving supply of funding from GMAC-RFC through a high volume of loan purchases.

101.   As a result of the OCC action, and the unwillingness of Defendant GMAC-RFC to continue to purchase "high-cost" or HOEPA loans, GNBT lacked substantial purchasers for its loan production. It did not have adequate reserves to maintain the loans in its own portfolio, and the predatory loan scheme that was the brain child of the Shumway Organization, Equity Plus, Equity Guaranty and their affiliates came to a thankful end, but not without leaving in its wake tens of thousands of victims across the country — victims who not only suffered from the high closing costs and high interest rates charged by this predatory scheme, but most of which became unable to sell their homes or even refinance their during this time of declining rates on terms that would have otherwise been favorable to them.

### Assignee Liability

102.   The Assignee-Defendants and the Defendant Class are liable to the Plaintiffs and the Plaintiff Class for the Banks' violations of federal law just as the Banks are liable as "creditors" (15 U.S.C. § 1602(f)) of the Plaintiffs, pursuant to HOEPA, at 15 U.S.C. § 1641(d).

103.    Additionally, while HOEPA denies the Assignee-Defendants and the Defendant Class any "holder in due course" defenses, such defense is not and would not otherwise be available to the Assignee-Defendants and the Defendant Class because they did not take the notes and purchase the Plaintiffs' loans in "good faith" and without notice that Plaintiffs' had defenses to the loans since each of the loans that they received, accompanied by the statutory notice required by 15 U.S.C. § 1641(d)(4) and the standard forms in the Plaintiffs' loan files such as the TILA and HOEPA Disclosures and the HUD-1s, provided actual knowledge of the TILA/HOEPA disclosure violations and would have provided notice to the Assignee-Defendants and Defendant Class that the Plaintiffs had defenses to enforcement of the loans.

104.    Further, the existence of the HOEPA § 1641(d)(4) notice eliminates any "holder in due course" defenses to the Plaintiffs' claims since it makes the borrowers' "promise to pay" conditional.

105.    The Assignee-Defendants and the Defendant Class took the promissory notes and trust deeds subject to the same restrictions, limitations, and defects as they had in the hands of the Banks and acquired no greater rights than its assignors had at the time of the assignment or sale of the loans.

## THE PLAINTIFFS' LOANS

### The HOEPA Mortgage Loan of Mr. Clell L. Hobson

106.    In early 2001 Mr. Hobson received a solicitation in the mail indicating that he had been pre-approved for a debt-consolidation second mortgage loan with CBNV. Mr. Hobson contacted "CBNV" to apply for a second mortgage loan. While he believed he was dealing with a bank, he was, in fact, dealing with the Shumway Organization and Equity Plus.

107.    On or about May 2, 2001, "CBNV" closed Mr. Hobson's loan (Loan No. CHAN-01-0001886) by Fed Ex delivery in Alabama and return the very next day via the return, pre-paid

– 34 –

Fed Ex envelope provided. For the first time, when the papers were delivered to him for closing did Mr. Hobson receive his TILA and HOEPA disclosures, which was less than 3 days prior to the closing of his loan.

108.    In connection with the above-alleged predatory lending scheme, the Shumway Organization, using CBNV as its front, loaned Mr. Hobson a total loan of $55,500.00 to be repaid with a note interest rate of 17.75% (APR of 19.904%) in consecutive monthly installments over a period of 20 years.  The loan was a consumer loan obtained for personal, family or household purposes.

109.    To secure repayment of his note, Mr. Hobson executed a deed of trust for the benefit of CBNV.  The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

110.    In connection with this HOEPA Mortgage Loan, as shown on his HUD-1 Settlement Statement (Exhibit 3), the following fees and costs were contracted for and paid at or before closing of Mr. Hobson's loan:

| HUD-1 Line No. | Description | Paid To | Amount in $ |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 2,497,50 |
| 802 | Loan Discount Fee | CBNV | 2,220.00 |
| 808 | Lender Document Review Fee | CBNV | 150.00 |
| 809 | Lender Underwriting Fee | CBNV | 295.00 |
| 810 | Lender Application Fee | CBNV | 275.00 |
| 1101 | Settlement or Closing Fee | Resource Title | 50.00 |
| 1102 | Abstract or Title Search | Resource Title/"GAC" | 175.00 |
| 1103 | Title Examination | Resource Title | 695.00 |
| 1105 | Document Preparation | Resource Title | 175.00 |
| 1201 | Recording Fee | Not identified | 45.00 |
| 1202 | City/County/stamps | Not identified | 83.25 |

111.    The HUD-1 is fraudulent in that the line items shown as being paid to CBNV in Section 800 were, other than perhaps a very small percentage, actually paid to Equity Plus or other affiliates of the Shumway Organization.

112.    The HUD-1 is fraudulent in that the line items shown as being paid to Resource Title in Section 1100 were, other than perhaps a very small percentage, actually paid to Equity Plus or other affiliates of the Shumway Organization. Moreover, the fees were neither bona fide nor reasonable. The charge for document preparation was bogus since the title company did not prepare any of the documents. Moreover, charging for preparation of TILA, HOEPA and RESPA disclosures is illegal under 12 U.S.C. § 2610.

113.    In connection with this loan, Mr. Hobson was provided with a Federal Truth-In-Lending Disclosure Statement (Exhibit 4) that stated that his Finance Charge was $152,996.30 and that his annual percentage rate was 19.904%, the same APR incorrectly disclosed in the 3-day advance HOEPA Notice (Exhibit 5) that was not delivered to Mr. Hobson until closing. The HOEPA Notice contained extraneous matter designed to detract from the elements required under 15 U.S.C. 1639, violated the "conspicuous type size" requirement of 15 U.S.C. § 1639(a) and contained a false acknowledgement of receipt "3 days before closing." Furthermore, even the false acknowledgement is deficient on its face for failing to state that the HOEPA Notice had been received "3 **_business_** days prior" to closing, 15 U.S.C. 1639(b)(1)(emphasis added). Mr. Hobson's HOEPA Notice merely states "3 days before closing." Finally, the HOEPA Notice states the "**_Note_**" interest rate of 17.750 % in the upper right-hand corner in a deliberate ploy designed to detract and confuse the borrower's understanding of the true APR disclosed below. 15 U.S.C. § 1639(a) defines the "Specific disclosures" required and makes no provision, expressly or implicitly, for the HOEPA Notice to contain any interest figure other than the required APR. This represents yet another separate violation of HOEPA Notice requirements for which the Banks and Assignee-Defendants are jointly and severally liable.

114.    Both the stated Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

115.    The terms of Mr. Hobson's Note (Exhibit 6) lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

### The HOEPA Mortgage Loan of Captain Rosa Kelly

116.    In the late summer of 2000, Captain Kelly received a solicitation in the mail indicating that she had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

117.    Captain Kelly contacted "GNBT" to apply for a second mortgage loan. While she believed she was dealing with a bank, she was, in fact, dealing with the Shumway Organization and Equity Plus.

118.    On or about September 27, 2000, "GNBT" closed Captain Kelly's loan by delivery of her closing documents via a courier who obtained Captain Kelly's execution of her closing documents in a public library near Decatur, Georgia.  Captain Kelly first received her TILA and HOEPA disclosures upon the courier's arrival, and upon the same date as the settlement date of her loan.

119.    In connection with the above-alleged predatory lending scheme, the Shumway Organization, using GNBT as its front, loaned Captain Kelly a total loan of $51,000 to be repaid with interest (13.990 %)(APR of 16.532 %) in consecutive monthly installments over a period of 25 years. The loan was a consumer loan obtained for personal, family or household purposes.

120.    To secure repayment of her note, Captain Kelly executed a security deed for the benefit of GNBT.  The security deed granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

121.    In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement (Exhibit 7), the following fees and costs were contracted for and paid at or before closing of Captain Kelly's loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 5,160 |
| 802 | Loan Discount | GNBT | 516 |
| 807 | Application | GNBT | 150 |
| 811 | Underwriting Fee | GNBT | 185 |
| 1101 | Settlement or Closing Fee | Title America LLC | 250 |
| 1102 | Abstract or Title Search | Title America LLC | 106 |
| 1103 | Title Examination | Title America LLC | 300 |
| 1112 | Document Review | Title America LLC | 260 |
| 1113 | Processing Fee | Title America LLC | 250 |

122.    The HUD-1 is fraudulent in that the line items shown as being paid to GNBT in Section 800 were, other than perhaps a very small percentage, actually paid to Equity Plus or other affiliates of the Shumway Organization. The HUD-1 is fraudulent in that the line items shown as being paid to Title America LLC in Section 1100 were, other than perhaps a very small percentage, actually paid to Equity Plus or other affiliates of the Shumway Organization. Moreover, the title charges were neither bona fide nor reasonable. The charge for document preparation was bogus since the title company did not prepare any of the documents. Moreover, charging for preparation of TILA, HOEPA and RESPA disclosures is illegal under 12 U.S.C. § 1610.

123.    In connection with this loan, Captain Kelly was provided with a Federal Truth-In-Lending Disclosure Statement (Exhibit 8) that stated that her Finance Charge was $109,105.81 and that her APR was 16.532 %. The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate. The same APR was incorrectly disclosed in Captain Kelly's HOEPA Notice (Exhibit 9) that she never received until the papers were delivered by courier for her closing, which was the same date as her date of settlement. Her HOEPA Notice violated the "conspicuous type size" requirement of 15 U.S.C. § 1639(a) and contained a false acknowledgement of receipt.

– 38 –

124.   The terms of Captain Kelly's Note (Exhibit 10) lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

### The HOEPA Mortgage Loan of Reverend John A. Nixon, Jr.

125.   In early 2001, Rev. Nixon received a solicitation in the mail indicating that he had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

126.   Rev. Nixon contacted "CBNV" to apply for a second mortgage loan. While he believed he was dealing with a bank, he was, in fact, dealing with the Shumway Organization and Equity Plus.

127.   On or about February 2, 2001, "CBNV" closed Rev. Nixon's loan (Loan No. 23KA148394). The closing documents were Fed Ex'd to his home in Alabama and were subsequently forwarded to him at a meeting he was attending in Florida.  Upon receipt, Rev. Nixon complied with the closing instructions and returned his executed closing documents the day after their receipt in Florida.  For the first time, when the papers were delivered to him for closing did Rev. Nixon receive his TILA and HOEPA disclosures, which was less than 3 *business* days prior to his signing and returning his loan documents.

128.   In connection with the above-alleged predatory lending scheme, the Shumway Organization, using CBNV as its front, loaned Rev. Nixon a total loan of $49,999.00 to be repaid with interest (18.25%)(APR of 20.261%) in consecutive monthly installments over a period of 25 years.  The loan was a consumer loan obtained for personal, family or household purposes.

129.   To secure repayment of his note, Rev. Nixon executed a deed of trust for the benefit of CBNV.  The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

130. In connection with this HOEPA Mortgage Loan, as shown on his HUD-1 Settlement Statement (Exhibit 11), the following fees and costs were contracted for and paid at or before closing of Rev. Nixon's loan:

| HUD-1 Line No. | Description | Paid To: | Amount in $ |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 3,999.92 |
| 803 | Appraisal Fee | L. Grant Mann | 175.00 |
| 807 | Application | CBNV | 275.00 |
| 1101 | Settlement or Closing Fee | Paramount Title | 50.00 |
| 1102 | Abstract or Title Search | "GAC" | 260.00 |
| 1103 | Title Examination | Paramount Title | 595.00 |
| 1105 | Document Preparation | Paramount Title | 175.00 |
| 1201 | Recording Fee | Clerk of Court | 109.00 |
| 1203 | Mortgage Tax | Clerk of Court | 74.99 |

131. The HUD-1 is fraudulent in that the line items shown as being paid to CBNV in Section 800 were, other than perhaps a very small percentage, actually paid to Equity Plus or other affiliates of the Shumway Organization.

132. The HUD-1 is fraudulent in that the line items shown as being paid to Paramount Title in Section 1100 were, other than perhaps a very small percentage, actually paid to Equity Plus or other affiliates of the Shumway Organization. Moreover, such fees were neither bona fide nor reasonable. The charge for document preparation was bogus since the title company did not prepare any of the documents. Moreover, charging for the preparation of TILA, HOEPA and RESPA disclosures is illegal under 12 U.S.C. § 2610.

133. In connection with this loan, Rev. Nixon was provided with a Federal Truth-In-Lending Disclosure Statement (Exhibit 12) that stated that his Finance Charge was $185,347.31 and that his APR was 20.261%. The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate. The same APR was incorrectly disclosed in Rev. Nixon's HOEPA Notice (Exhibit 13) that he never received until the day before he signed and returned his loan documents. The HOEPA Notice Rev. Nixon received the day before signing and

– 40 –

returning his closing papers violates the "conspicuous type size" requirement of 15 U.S.C. 1639(a) and contains the false acknowledgement that Rev. Nixon received his HOEPA Notice "at least three (3) business days before closing."

### The HOEPA Mortgage Loan of Mr. & Mrs. Jerome Roberts

134.    In the fall of 2000, Mr. and Mrs. Jerome Roberts received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

135.    Mr. and Mrs. Roberts contacted "GNBT" to apply for a second mortgage loan. While they believed they were dealing with a bank, they were, in fact, dealing with the Shumway Organization and Equity Plus.

136.    On or about October 9, 2000, "GNBT" closed the Roberts loan with a courier who conducted the closing at Mr. Robert's work location in Sandy Springs. Upon meeting with the courier the Roberts immediately executed their closing documents. The Roberts first received their TILA and HOEPA disclosures at the time the documents were delivered by courier. Since they signed immediately, their advance HOEPA Notice was not delivered three business days before their closing.

137.    In connection with the above-alleged predatory lending scheme, the Shumway Organization, using GNBT as its front, loaned the Roberts a total loan of $39,000 to be repaid with interest (14.99 %)(APR of 17.828 %) in consecutive monthly installments over a period of 25 years. The loan was a consumer loan obtained for personal, family or household purposes.

138.    To secure repayment of their note, the Roberts executed a security deed for the benefit of GNBT. The security deed granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

139.   In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement (Exhibit 13), the following fees and costs were contracted for and paid at or before closing of the Roberts' loan:

| HUD-1 Line No. | Description | Paid To: | Amount in $ |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 3,900 |
| 802 | Loan Discount | GNBT | 780 |
| 811 | Underwriting Fee | GNBT | 185 |
| 813 | Application Fee | GNBT | 150 |
| 1101 | Settlement or Closing Fee | Title America LLC | 250 |
| 1102 | Abstract or Title Search | Title America LLC | 106 |
| 1103 | Title Examination | Title America LLC | 300 |
| 1112 | Document Review Fee | Title America LLC | 260 |
| 1113 | Processing Fee | Title America LLC | 250 |

140.   The HUD-1 is fraudulent in that the line items shown as being paid to GNBT in Section 800 were, other than perhaps a very small percentage, actually paid to Equity Plus or other affiliates of the Shumway Organization.

141.   The HUD-1 is fraudulent in that the line items shown as being paid to Title America LLC in Section 1100 were, other than perhaps a very small percentage, actually paid to Equity Plus or other affiliates of the Shumway Organization. Moreover, the title charges were neither bona fide nor reasonable. The charge for document preparation was bogus since the title company did not prepare any of the documents and it is illegal to charge for preparation of TILA, HOEPA and RESPA disclosures under 12 U.S.C. § 1610.

142.   In connection with this loan, the Roberts were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $116,570.41 and that their APR was 17.828 %. (Exhibit 14). The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate. The same APR was incorrectly disclosed in the Roberts' HOEPA Notice (Exhibit 15), which they never received until the papers were delivered by courier and signed immediately.

143.   The HOEPA Notice contained the false acknowledgement that the Roberts had "read and received, three business days prior to settlement, a copy of this disclosure statement." The acknowledgement, besides being false, is deficient on its face in that it does not state the required elements in a "conspicuous type size" as required by 15 U.S.C. § 1639(a).

144.   The terms of the Roberts Note lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

## EQUITABLE ESTOPPEL, EQUITABLE TOLLING AND CLASS ACTION TOLLING OF LIMITATIONS PERIODS

145.   CBNV, GNBT and the Shumway Organization, and each of them, knowingly and actively misled the Plaintiffs and the Plaintiff Class Members concerning their "rent-a-bank-charter" predatory lending scheme and/or their involvement therein and knowingly and actively prevented the Plaintiffs and the Class Members from pursuing their claims by, among other things:

(a).   Engaging in a scheme that was by its nature and design "self-concealing;"

(b).   Knowingly and actively deceiving Plaintiffs and all Class Members through their "rent-a-bank-charter" scheme, in their HUD-1s and associated loan documentation and otherwise concealing the true nature of their illegal lending practices;

(c).   Knowingly and actively concealing that the origination fees, discount fees or other types of fees and charges listed in Section 800 of the HUD-1s were being paid to GNBT or CBNV, and title-related charges listed in Section 1100 of the HUD-1s were being paid to third-party title companies when such fees and charges were instead being kick-backed to and shared with, directly or indirectly, the Shumway Organization, Equity Guaranty LLC or Equity Plus Financial LLC, or affiliated entities or persons of such companies and/or otherwise knowingly concealing the true nature of such fees;

**(d).**     Knowingly and actively concealing the understatement of Finance Charges, the the overstatement of the Amount Financed and the resulting understatement of the APRs on the TILA Disclosure Statements and HOEPA Notices provided to Plaintiffs and all Class Members by, among other things, failing to include in their calculations certain title charges that were not bona fide, reasonable, lawful and/or not paid to true third parties;

**(e).**     Concealing the true purpose and the actual recipients of the fees set forth on the HUD -1s;

**(f).**     Concealing the import of the false acknowledgement of receipt in all HOEPA Notices:

**(g).**     Knowing full well their various HOEPA violations as detailed above, falsely representing to all Plaintiffs and Class Members that they had a right to rescind within three (3) days when the Banks knew to a certainty as a matter of law that their violations of HOEPA afforded every Plaintiff and Class Member a full *three-year* period to rescind under the provisions of 15 U.S.C. § 1635(f);

**(h).**     Knowingly and actively preventing the Banks' federal regulators (FDIA and OCC) from disseminating reports of their wrongdoing to the public, thereby suppressing Plaintiffs and Class Members from discovering their causes of action against the Banks and Assignee-Defendants until the one-year limitations periods for TILA and RESPA had long since elapsed for the great majority of the Class Members.

146.     Plaintiffs exercised reasonable diligence during their loan transactions and dealings with the Banks and in reviewing their loan documentation, but could not have, nor been reasonably expected to, uncover the complex set of facts and the highly sophisticated scheme giving rise to their claims against Defendants due to the fraudulent concealment, unlawful and conspiratorial conduct of CBNV, GNBT and the Shumway Organization. Indeed, because TILA,

HOEPA and RESPA are technical statutes, it is highly questionable whether any attorney not well-versed in those statutes would have been able to determine violations of TILA, HOEPA and RESPA upon review of the Plaintiffs' loan documents or been able to unravel the egregiousness of the predatory lending and "rent-a-bank-charter" scheme without filing a lawsuit and engaging in extensive discovery — a course of conduct that would as a matter of fact and law constitute *extraordinary* diligence rather than the *reasonable* diligence expected under the law.

147. GMAC-RFC and all other Assignee-Defendants are also estopped to challenge Plaintiffs' and Class Members' reliance upon equitable tolling and estoppel to toll TILA's and RESPA's one-year statute of limitations. If the Assignee-Defendants with legions of lawyers and compliance experts whose sole function is to search for and discover loan violations did not discover the Banks' TILA, HOEPA and RESPA violations, they are estopped to contend that consumer Plaintiffs and Class Members not trained in the law should have discovered their claims within a year of their loan closings. Indeed, having knowingly and intentionally concocted and concealed their fraudulent scheme, the Banks are estopped by their unclean hands to rely upon statutes of limitations that, if sustained, would reward the Banks' successful and continuing concealment. Any equitable tolling or equitable estoppel that lies against the Banks applies with equal force Assignee-Defendants who stand in the Banks' shoes under the assignee liability features of HOEPA. 15 U.S.C. § 1641(d).

148. The entire "rent-a-bank-charter" predatory lending scheme worked, and could only have worked, through the cooperation and conspiratorial efforts of each of Banks with the Shumway Organization, Equity Plus and Equity Guaranty and the willful blindness of the non-Bank Defendants and the Defendant Class to the scheme's occurrence. At all times, through the concealment of the existence of and nature of Equity Plus or Equity Guaranty and their relationship with the title companies, Plaintiffs were actually misled into thinking that the Banks

and the title companies were doing legitimate business and that the fees and costs being charged were reasonable and bona fide and paid, with respect to the title fees, to legitimate title companies.

149.    Finally, if the CBNV/GNBT Excluded Class is joined herein by the Third Circuit finding the *CBNV/GBNT Class Action* proceedings to have been void for lack of subject matter jurisdiction, all Class Members would enjoy the doctrine of legal tolling under *American Pipe & Construction Co. v. Utah,* 414 U.S. 538 (1974). *American Pipe* and its progeny generally hold that legal tolling arising from the prior pendancy of a former class action is only available in subsequent *individual* actions, and not available in *subsequent* class actions based on the prior pendancy of a former class action. If, however, *Kessler* is void for lack of jurisdiction then it is void for all purposes, including its lack of constituting a prior pending class action for *American Pipe* purposes.

## CLASS ACTION ALLEGATIONS

### The Plaintiff Class

150.    This action is properly brought as a Plaintiff class action under Fed.R.Civ.P. 23. Plaintiffs propose, as the definition of the Plaintiff Class, that the Plaintiff Class consists of all persons nationwide who satisfy the following criteria:

(a).    Who obtained a first, second or subordinate, non-purchase money, HOEPA qualifying mortgage loan from CBNV or GNBT that was secured by residential real property used by the Class Members as their principal dwelling; and

(b).    Who are **not** members of the national class subject to the Class Settlement certified and approved in the CBNV/GNBT Class Action by virtue of either: (1) not being included within the current definition of the class in that action or as such definition may be

modified, reversed or affirmed by the United States Court of Appeals for the Third Circuit in the appeals relating thereto; and/or (2) having affirmatively opted out of that class action.

(c).    Specifically excluded from the proposed Class are officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, of any of the Defendants or members of the Defendant Class or entities controlled by the Defendants or members of the Defendant Class and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants or members of the Defendant Class, or any of them; all governmental entities and persons who previously released the Defendants or have filed their own action against the Defendants.

151.    The particular members of the Plaintiff Class are capable of being identified without difficult managerial or administrative problems.  For example, the members of the Plaintiff Class are readily identifiable from the information and records in the possession or control of CBNV, GNBT and the Defendants and the Defendant Class and/or the representatives or servicing agents of each.

152.    The Class Members are so numerous that individual joinder of all members is impractical.  Upon information and belief, Plaintiffs state that there are *presently* over 2,000 members of the Plaintiff Class and if the CBNV/GNBT Class Settlement is held to be void or otherwise overturned, this Plaintiff Class will include approximately 46,000 borrowers.

153.    There are questions of law and fact common to the Plaintiff Class, which questions predominate over any questions affecting only individual Plaintiff Class members and, in fact, the wrongs suffered and remedies sought by Plaintiffs and the other Plaintiff Class members involve numerous common violations of TILA, HOEPA and RESPA, which involve common documentary proof, the only difference being the exact monetary amount to which each

– 47 –

Plaintiff Class member is entitled, a matter of mere mathematical calculation.  The principal common issues are:

(a)      The nature and extent of the predatory lending and "rent-a-bank-charter" scheme;

(b)      Whether the loans of the Plaintiff Class Members were "HOEPA" loans;

(c)      Whether the Plaintiff Class Members' HUD-1 or HUD1-A Settlement Statements uniformly concealed and/or misrepresented the identity of the recipients, nature or the amounts of the settlement fees and charges imposed on their loans;

(d)      Whether, in the circumstances herein sounding principally in concealment of required federal disclosures, the Plaintiff Class Members are entitled to a finding of their presumptive reliance upon the completeness, accuracy and timeliness of all federal disclosures;

(e)      Whether, in the circumstances of egregious concealment of all aspects of the Banks' and Shumway/Bapst's lending scheme, the applicable statutes of limitation are tolled against the Banks and all Assignee-Defendants under the doctrines of equitable tolling, equitable estoppel, legal tolling and other maxims of equity;

(f)      Whether the predatory lending and "rent-a-bank-charter" scheme violated RESPA;

(g)      Whether Defendants and the Defendant Class are liable in treble damages to the Plaintiff Class Members for violations of RESPA;

(h)      Whether, as part of the predatory lending and "rent-a-bank-charter" scheme, CBNV and GNBT utilized a practice or device whereby the mandatory disclosures under TILA were   not timely made;

(i)      Whether, as part of the predatory lending and "rent-a-bank-charter" scheme, CBNV and GNBT made inaccurate TILA disclosures to the Plaintiff Class Members';

(j)      Whether certain of the Plaintiff Class Members' Notes failed to disclose required

– 48 –

HOEPA disclosures restricting prepayment penalties or other prohibited terms;

(k)     Whether the Plaintiff Class Members' HOEPA Notices were displayed in the required conspicuous type size manner;

(l)     Whether the Plaintiff Class Members' HOEPA Notices contained knowingly false acknowledgments of receipt before closing;

(m)     Whether certain of the Plaintiff Class Members' acknowledgments of receipt, although known to the Banks to be false, were nevertheless deficient in asserting receipt within no specified period or within "3 days" or "72 hours" before closing, but *not asserting* the number of "*business*" days before closing;

(n)     Whether the predatory lending and "rent-a-bank-charter" scheme violated HOEPA;

(o)     Whether the Plaintiff Class Members who closed their loans less than three years before this case's filing on July 30, 2004, are entitled to rescind their loans;

(p)     Whether the assignee liability of HOEPA (15 U.S.C.§ 1641(d)) applies to the claims of Plaintiffs and the Plaintiff Class and to the Defendants and the Defendant Class;

(q)     The  nature and extent of the remedies available to the Plaintiff Class members under RESPA;

(r)     The nature and extent of the remedies available to the Plaintiff Class Members under TILA and HOEPA;

(s)     Whether the aforesaid use of the U. S. Postal Service and interstate couriers in furtherance and consummation of the Banks' lending scheme constituted mail fraud;

(t)     Whether the aforesaid use of interstate wires in furtherance and consummation of the Banks' lending scheme constituted wire fraud:

(u)     The nature and extent of the remedies available to the Plaintiff Class Members

under RICO; and

(v)     The nature and extent of the declaratory and injunctive relief available to the Plaintiff Class members.

154.    The Plaintiffs' claims are typical of those of the members of the Plaintiff Class and are based on the same legal and factual theories.

155.    The representative Plaintiffs will fairly and adequately represent and protect the interests of the Plaintiff Class. Plaintiffs have suffered substantial economic injury in their own capacity from the practices complained of and understand the nature of their duty as representatives of the Class, the nature and extent of their claims against Defendants and the Defendant Class and the relief available to them and the Class Members. Neither Plaintiffs nor their counsel have any conflicting interests which might cause them not to vigorously pursue this action.

156.    Plaintiffs have retained counsel with extensive knowledge of RESPA, TILA, HOEPA and RICO that are experienced in handling class actions and actions involving predatory lending and unlawful commercial practices, including other actions involving these same Defendants and this same predatory lending and "rent-a-bank-charter" scheme. Accordingly, the undersigned Counsel will provide exceptional representation of the Plaintiffs and the Class.

157.    Certification of a Plaintiff Class under Fed. R. Civ. P. 23(b)(3) is also appropriate as to Defendants and the Defendant Class, in that common questions common to the Plaintiff Class predominate over any questions pertaining to individual Plaintiff Class Members and a Plaintiff class action is superior to other available methods for the fair and efficient adjudication of this controversy. A Plaintiff class action will cause an orderly and expeditious administration of Plaintiff Class Members' claims and economies of time, effort and expense will be fostered and uniformity of decisions will be insured. Moreover, the individual Plaintiff Class Members

are certain to be unaware of and ignorant of their rights and not in a position (either through experience or financially) to commence individual litigation against Defendants and the Defendant Class. Expecting the Plaintiff Class Members to bring claims individually is unrealistic and unfeasible, which is evidenced by the fact that Congress specifically provided for class actions in TILA and HOEPA. The only practical means of rectifying these problems and providing wide spread relief is through class action procedure.

### The Defendant Class

158.    This action is also properly brought as a Defendant Class under Fed.R.Civ.P. 23. Plaintiffs propose, as the definition of the Defendant Class, that the Defendant Class be defined as follows:

> "Those persons or entities or their trustees that purchased or were assigned the HOEPA loans of the Plaintiffs or the Plaintiff Class which were purportedly generated by either CBNV or GNBT."

159.    The particular members of the Defendant Class are capable of being described without difficult managerial or administrative problems. The members of the Defendant Class are readily identifiable from the information and records in the possession or control of CBNV, GNBT or the Shumway Organization or its affiliated entities and from the other Defendants who have since assigned these loans to other members of the Defendant Class and/or their representatives or servicing agents of such HOEPA loans.

160.    Upon information and belief, the Defendant Class members are sufficiently numerous that individual joinder of all members is impractical. This allegation is based on the fact that CBNV and GNBT "generated" extensive HOEPA loans on a nationwide basis. Even excluding the CBNV/GNBT Excluded Class leaves several thousand loans assigned to a number of entities.

161.   There are questions of law and fact common to the Defendant Class which questions predominate over any questions affecting only individual members of the Defendant Class and, in fact, the wrongs alleged against non-Bank Defendants and the Defendant Class members and the remedies sought by Plaintiffs and the Plaintiff Class members against such Defendants are identical, the only difference being the exact monetary amount to which each Defendant and Defendant Class Member is liable to the respective members of the Plaintiff Class. The principal common issues are: (a) Whether the Defendants and the Defendant Class members are liable to the Plaintiff and the Plaintiff Class members as a result of the aforementioned predatory lending scheme and the wrongful acts and violations of TILA, HOEPA, RESPA and RICO by the Banks and any later amended claims against CBNV and GNBT and the other participants in this predatory lending, rent-a-bank-charter scheme; and/or (b) whether the Defendant Class is entitled to assert any defenses to such violations.

162.   The non-Bank Defendants' defenses and those of the Defendant Class Members (which defenses are denied) are typical of those of the individual Assignee-Defendants and will be based on the same legal and factual theories.

163.   The non-Bank Defendants, in representing their own interest will also fairly and adequately represent and protect the interests of the Defendant Class.   Those non-Bank Defendants will, as they have in the past, retain counsel experienced in defending class actions and actions involving unlawful commercial practices.   Said defendants do not, based upon information and belief, have any interests which might cause them not to vigorously defend this action.

164.   Certification of a defendant class under Fed.R.Civ.P. 23 (b)(3) is appropriate as to the Defendant Class Members in that common questions predominate over any individual questions and a defendant class action is superior for the fair and efficient adjudication of this

controversy. A defendant class action will cause an orderly and expeditious administration of Defendant Class members defenses, if any, and economies of time, effort and expenses will be fostered and uniformity of decisions will be insured.

## CAUSES OF ACTION AGAINST DEFENDANTS

### COUNT I

#### Violations of TILA, as Amended by HOEPA, for Concealment of Fraudulent Scheme and Withholding Material Disclosures

165.    Each proceeding paragraph of this Complaint is hereby incorporated as if fully set forth herein.

166.    The loans of the Plaintiffs are "HOEPA" loans governed by the provisions of the HOEPA amendments to TILA and satisfy the definition for HOEPA loans provided at 15 U.S.C. § 1602(aa) and at Regulation Z at 12 C.F.R. § 226.32.

167,    CBNV and GNBT issued to each borrower Plaintiff a HOEPA Notice (15 U.S.C. § 1639(a) & (b)) and issued to Defendants a HOEPA Notice of Assignment (15 U.S.C. §1641(d)(4)).

168.    Each of the Plaintiff Class members' loans that was consummated within the three-year period preceding the filing of the case on July 30, 2004, retains the right of cancellation or rescission provided by 15 U.S.C. § 1635 and 12 C.F.R. § 226.23.

169.    TILA, as amended by HOEPA, at 15 U.S.C. §§ 1602(u), 1638, 1639, and its implementing regulation, Regulation Z, require c editors to make specific, timely and accurate disclosures of "material" information to borrowers to promote the "informed use of credit." The "material" information includes the "annual percentage rate, the method of determining the finance charge and the balance upon which a finance charge will be imposed, the amount of the finance charge, the amount to be financed, the total of payments, the number and amount of

payments, the due dates or periods of payments scheduled to repay the indebtedness," and the disclosures required by HOEPA at § 1639(a).

170.    Certain tolerances for accuracy are allowed at 15 U.S.C. §§ 1605(f), 1610(c) and Regulation Z, at 12 C.F.R. § 226.22 and 226.23 for the disclosure of the Finance Charge and Annual Percentage Rate.

171.    CBNV and GNBT made multiple violations of HOEPA and TILA by their failure to give accurate HOEPA/TILA Finance Charge and APR disclosures under 15 U.S.C. §§ 1638 and 1639.

172.    CBNV and GNBT made multiple violations of HOEPA and TILA by withholding required HOEPA disclosures as to prepayment penalties as to certain Class Members' loans under 15 U.S.C. §§ 1638 and 1639.

173.    CBNV and GBNT committed other separate HOEPA disclosure violations described and enumerated *supra* at pp. 10-14, ¶¶ 28(a) to (f).

174.    The Plaintiffs and the Plaintiff Class entered into HOEPA mortgage loan transactions with CBNV and GNBT. As an incident to or a condition of the Banks' extension of credit to Plaintiffs and Plaintiff Class members, the Banks charged the Plaintiffs and the Plaintiff Class members certain fees and charges to be paid directly or indirectly by the Plaintiff Class members in order to obtain the HOEPA mortgage loans.

175.    The Banks falsely and incorrectly represented that the amounts charged to the Plaintiffs and Plaintiff Class members as title charges in section 1100 of the Plaintiffs' HUD-1s for such things as "abstract or title searches" (line 1102) and "title examinations" (line 1103) and in certain instances "document review" (line 1112) and/or "settlement or closing fees" (line 1101) and document preparation fees were charges never incurred by the Banks. These charges were not "bona fide" and "reasonable" nor paid to "true" third parties. In fact, they were being

used directly or indirectly to further the rent-a-bank-charter predatory lending scheme and to provide kickbacks and unearned fees to the Shumway Organization, Equity Plus, Equity Guaranty and their associated entities or persons, and that Defendants were directly or indirectly profiting from such fees.

176. These title-related fees and charges set forth in Section 1100 of the Plaintiffs and Plaintiff Class members' HUD-1s were neither bona fide nor reasonable and were not, in fact, paid to "true" third parties.

177. Further, in each instance, the Plaintiffs and Plaintiff Class members were required to use the title companies and to pay the charges as a condition of or an incident to the extension of credit.

178. As such, all of the section 1100 fees and charges were required to be *included* in the calculation of the Finance Charge and the Amount Financed on the Class Members' loans. The Banks, as a routine and typical practice, as evidenced from the HUD-1s and the Truth-in-Lending Disclosure Statements that they provided to the Plaintiffs and the Plaintiff Class members, *excluded* certain of the section 1100 title charges from the Finance Charge and the Amount Financed. For example, in each instance, the bogus, excessive and unnecessary "abstract or title search fees" (line 1102) and "title examination fees" (line 1103) charged to the Plaintiffs and Plaintiff Class members were **excluded** from the calculation of the Finance Charge when they should have been *included* in the Finance Charge. Conversely, the same amounts were no used in the calculation of the Amount Financed when they should have been *deducted* from the Amount Financed.

179. Because the section 1100 title charges for abstracts and title examinations were not bona fide and reasonable, they were improperly excluded from the calculations of the Finance Charge and Amount Financed and should have been included in the calculation of the

Finance Charge and Amount Financed. Thus, in each and every instance the *disclosed* Finance Charge on the Plaintiffs' and the Plaintiff Class Members' loans was understated, and the Amount Financed on which the APR is calculated was overstated. As a result, the *disclosed* Finance Charges and Amount Financed were inaccurate and violated TILA and HOEPA at 15 U.S.C. §§ 1605(f), 1635, 1638 and 1639 and Regulation Z, at 12 C.F.R. § 226.23.

180.    Further, having improperly overstated the Amount Financed, the Banks inaccurately disclosed the Annual Percentage Rate (APR) on the loans of the Plaintiffs and the Plaintiff Class Members. In each and every instance, as evidenced from the HUD-1s and the Truth in Lending Disclosure Statements that they provided to the Plaintiffs and the Plaintiff Class Members, the Banks disclosed APRs that were understated from the properly calculated and Actual APR.

181.    In each and every instance, the disclosed APR was understated by more than the $1/8^{th}$ of a basis point or the 0.125% tolerance for error provided by Congress. As a result, the disclosed APRs were inaccurate and violated TILA and HOEPA at 15 U.S.C. §§ 1606(c), 1635, 1638 and 1639 and Regulation Z, at 12 C.F.R. § 226.22.

182.    Because certain of the section 1100 title charges were improperly excluded from the calculation of the Finance Charge and should have been included in the calculation of the Finance Charge, in each and every instance the *disclosed* Finance Charge on the Plaintiffs' and the Plaintiff Class members' loans was understated, and varied from the Actual Finance Charge by more than $100 or by more than ½ of one percent of the gross loan amount. Because the APR is a required element of the advance HOEPA Notice required 3 business days before closing, 15 U.S.C.§ 1639(a)(2)(A), it matters not when the HOEPA pre-closing notice was delivered because the disclosed APR in the notice, being identical to the underdisclosed APR in the TILA Statement, rendered the notice defective as a matter of law and represented a *per se* violation of

– 56 –

HOEPA Notice requirements without regard for delivery. Because it is an ***advance*** disclosure, a HOEPA Notice's deficiencies cannot be cured after the fact without closing a new loan with proper advance disclosures. So far as Plaintiffs' Counsel know, the Banks and all Defendant-Assignees elected as to every loan to "let sleeping dogs lie."

183.    The Banks and certain of the other Defendants were well aware of the fraudulent conduct described above and the violations of HOEPA and TILA and knew at all material times that the majority of the fees would be dispersed to the Shumway Organization and Equity Plus and Equity Guaranty by the sham title companies used to close HOEPA mortgage loans. However, because of their insatiable appetite for the high-cost, high-interest loans, the Defendants and the Defendant Class who were originally assigned such loans allowed the Shumway Organization and Equity Plus and Equity Guaranty, their captive title companies and the Banks continued to violate HOEPA and TILA.  Contrary to RESPA, the Shumway entities were never disclosed as affiliated business entities. 12 U.S.C. § 2607. As described above, by agreeing to purchase the HOEPA mortgage loans from the Banks, in essence funding the loans, the HOEPA/TILA violation cycle was perpetuated and continued.

184.    Under 15 U.S.C. § 1635(a), Plaintiff Class Members, whose loans were consummated within the three-year period preceding the filing of this case on July 30, 2004, remain entitled to assert claims for rescission against any assignee or holder of their notes and mortgages.

185.    Under 15 U.S.C. § 1641(d) Defendants and the Defendant Class members are subject to all claims and defenses that the Plaintiffs and Plaintiff Class members have against CBNV and GNBT.  Under 15 U.S.C. § 1635(g), Plaintiffs and the Plaintiff Class members are also entitled to additional relief under 15 U.S.C. § 1640 not related to their rescission rights.

186.    Accordingly, as a result of (1) the *disclosed* Finance Charges being inaccurate and understated by more than $100 or ½ of one percent of the gross loan amount in every instance; (2) the *disclosed* APRs being inaccurate and understated by more than 0.125 % in every HOEPA Notice; (3) the withholding of the required HOEPA Notice until the day before closing (loans closed by Fed Ex) or until the day of closing for attorney or courier closings: and (4) certain Class Members' loans lacking required HOEPA disclosures respecting pre-payment penalties, and other HOEPA violations detailed herein, the loans violate HOEPA and TILA and the Plaintiffs are entitled to damages under 15 U.S.C. §§ 1635, 1639, 1640 and 1641(d), including, all (1) actual damages; (2) statutory damages; (3) rescission rights and damages; and (4) an amount equal to the sum of all finance charges and fees paid by the Class Members for each and every *separate* HOEPA violation as to each and every *separate* borrower.

### COUNT II

#### Violations of TILA, as Amended by HOEPA, for Failure
#### to Make Timely Disclosures of the APR and Finance Charges

187.    Each proceeding paragraph of this Complaint is hereby incorporated as if fully set forth herein.

188.    The loans of the Plaintiffs and all Plaintiff Class members are "HOEPA loans governed by the provisions of the HOEPA amendments to TILA and satisfy the definitions for HOEPA loans provided in 15 U.S.C. § 1602(aa).

189.    CBNV and GNBT issued to each borrower Plaintiff a HOEPA Notice (15 U.S.C. § 1639(a) & (b)) and Defendants a HOEPA Notice of Assignment (15 U.S.C. §1641(d)(4)).

190.    TILA, as amended by HOEPA, at 15 U.S.C. §1639(b)(1) expressly required the Banks to provide certain HOEPA disclosures "not less than three *business* days *prior* to consummation of the transaction."

191.    Section 103(y) of TILA (15 U.S.C. § 1602(y)) incorporates by reference any requirement imposed by Regulation Z promulgated by the Federal Reserve Board.  Section 103(y) specifically provides: "Any reference to any requirement imposed under this [TILA] title or any provision thereof includes reference to the regulation of the [Federal Reserve] Board under this title or the provision thereof in question."

192.    Regulation Z, Section 226.2 (a)(13) defines "consummation" as follows: "(13) *Consummation* means that time the consumer becomes contractually obligated on a credit transaction." 12 C.F.R. §226.2(a)(13).

193.    Plaintiffs and the Class Members became "contractually obligated" when they executed their notes and security deeds on the dates of their closings.

194.    Defendants had actual knowledge that the Plaintiffs' HOEPA mortgage loans were subject to the requirements of HOEPA.

195.    GNBT or CBNV, in contravention of HOEPA at 15 U.S.C. §1639(b)(1), and for most, if not nearly all, such loans did not provide timely notice as required by TILA and HOEPA, but, in fact, first provided the required HOEPA Notice with the closing papers for such loans and less than 3 business days before the consummation of such loans, which can be readily ascertained by a review of the applicable Fed Ex closings or the records of the attorney or courier closings.

196.    The Banks' violations of HOEPA were intentional.  Integral to the predatory lending and "rent-a-bank-charter" scheme was the "Banks'" (i.e. the Shumway Organization and its affiliated entities') regular practice of withholding timely disclosures. Because the HOEPA Notices were defective as a matter of law for understatement of the true APR, failure to set forth the required disclosures in conspicuous type size, insertion of false receipt acknowledgements as to the HOEPA Notices, and deficient receipt acknowledgements failing to specify the receipt

period in "business" days, the HOEPA Notices were worth nothing for compliance purposes regardless of when they were purportedly delivered.

197.    Under 15 U.S.C. § 1635(a), those certain Plaintiff Class members whose loans were consummated within the three-year period preceding the filing of this case on July 30, 2004, are entitled to assert claims for rescission against any assignee or holder of their notes and mortgages.

198.    Under 15 U.S.C. § 1641(d) Defendants are subject to all claims and defenses that the Plaintiffs and Plaintiff Class members have against CBNV and GNBT.

199.    Under 15 U.S.C. § 1635(g), Plaintiffs and the Plaintiff Class members are also entitled to additional relief under 15 U.S.C. § 1640 not related to their rescission rights.

200.    As a result of the Banks' failure to make timely and proper HOEPA disclosures, the loans violate HOEPA and Plaintiffs and the Class Members are entitled to damages under 15 U.S.C. §§ 1635, 1639, 1640 and 1641(d), including, all (1) actual damages; (2) statutory damages; (3) rescission rights and damages; and (4) an amount equal to the sum of all finance charges and fees paid by the Class Members for each and every *separate* HOEPA violation as to each and every *separate* borrower.

201.    The other HOEPA disclosure violations respecting: (1) failure to present in "conspicuous type size" the HOEPA Notice disclosures; (2) falsification of the receipt acknowledgement on each HOEPA Notice; (3) use of HOEPA Notice receipt acknowledgements stated in days or hours rather than "*business*" days; and (4) failure to include the restriction on collection of prepayment penalties in a refinancing by the original creditor are sufficiently detailed at pp. 10-14, ¶¶ 28(a) – (f) and bear no repeating here.

## COUNT III

### Violations of the Real Estate Settlement Procedures Act

202.    Each proceeding paragraph of this Complaint is hereby incorporated as if fully set forth herein.

203.    The Banks' and the Shumway Organization's "rent-a-bank-charter" predatory lending scheme also violated RESPA at 12 U.S.C. § 2607.

204.    The note and mortgage that each Plaintiff and Class Member entered into with CBNV and GNBT created a "federally related mortgage loan" as defined at 12 U.S.C. § 2602(1).

205.    The Banks, along with the Shumway Organization, Equity Plus, Equity Guaranty, and their affiliated companies, with the knowledge and consent of Defendants, as part of the predatory lending and "rent-a-bank-charter" scheme, used the Plaintiffs' HUD-1 Settlement Statements to conceal illegal kickbacks and referral fees being paid to the Shumway Organization, Equity Plus, Equity Guaranty and others on the HOEPA mortgage loans by the Banks.

206.    The section 800 charges listed on the HUD-1s uniformly misrepresented that origination and loan discount fees were being paid to the Banks when, in fact, said fees were being paid and kicked back almost entirely to the Shumway Organization and Equity Plus and Equity Guaranty, and the Banks were receiving only a small portion of those fees, which fees were instead going to the promoters of these illegal loans in the form of kickbacks or finders' fees.

207.    The section 1100 charges listed on the HUD-1s, in violation of RESPA at 12 U.S.C. § 2607, and RESPA's implementing regulations, Regulation X, at 24 C.F.R. § 3500.14,

– 61 –

were imposed for services that were not bona fide, not rendered, or for nominal or duplicative services for which no fees were earned and for which no fees should have been imposed.

208.   The Shumway Organization, Equity Plus and Equity Guaranty, and the Banks misrepresented in the HUD-1s that the fees being imposed in Section 1100 of the HUD-1s for title-related services purportedly done by the title companies were in fact being paid to the title companies.   However, because the title companies were owned and/or controlled by the Shumway Organization and were nothing more than sham entities, the HUD-1s were actually being used to conceal kickbacks and fees splits between the Shumway Organization, Equity Plus, Equity Guaranty and others on one hand and the Banks on the other hand.

209.   Further, by virtue of the "rent-a-bank-charter" scheme, the Banks' and Equity Plus' and Equity Guaranty's concealed "affiliated business arrangements" with their controlled title companies, and other affiliated or related entities, were nothing more than "sham arrangements" used as subterfuge for padding the settlement fees and for passing referral fees back to Equity Plus, Equity Guaranty and the Shumway Organization, all in violation of RESPA at 12 U.S.C. § 2607, and Regulation X, at 24 C.F.R. § 3500.15.

210.   In fact, the Banks required the Plaintiffs and the Plaintiff Class members to use the title companies or an affiliate thereof and then pursuant to their scheme passed along the title-related charges to Equity Plus, Equity Guaranty and the Shumway Organization.

211.   As a pattern and practice, the borrowers would not receive the disclosure of affiliate relationship form required by 12 U.S.C. § 2607(c)(4)(A) apprising them of the joint ownership or control of Equity Plus and Equity Guaranty and the title companies used to close the loans.

212.   The Banks and the first tier of Assignee-Defendants were aware of the fraudulent conduct described above and the violations of RESPA and knew at all material times that the

majority of the fees would be dispersed to the Shumway Organization and Equity Plus and Equity Guaranty by the sham title companies used to close HOEPA mortgage loans. However, because of their insatiable appetite for the high-cost, high-interest loans, such Defendants allowed the Banks to violate RESPA. As described above, by agreeing to purchase the HOEPA mortgage loans from the Banks, in essence funding not only the loans, but the RESPA kickback and fee-split cycle were perpetuated and continued by such purchases by the said Defendants.

213.    As a result of the RESPA violations above alleged, Plaintiffs and the Class have been damaged in an amount to be determined at a trial of this action, where they will seek all permissible treble damages, costs and reasonable attorneys' fees.

## COUNT IV

### Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) and 1962(d)

214.    Each proceeding paragraph of this Complaint is hereby incorporated as if fully set forth herein.

215.    Defendants have violated the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. Section §§ 1962(c) and (d).

216.    The Defendant Banks and the Assignee-Defendants were all "persons" employed by or associated with enterprises engaged in, or the activities of which affect, interstate or foreign commerce.

217.    Defendants committed multiple acts of mail and wire fraud (as well as other unlawful acts) constituting a pattern of racketeering activity through a conspiracy in which they directly or indirectly participated in, maintained an interest in, and conducted the affairs and conduct of enterprises that directly, proximately, and foreseeably caused injury to the Plaintiffs.

218.   The Plaintiffs' HUD-1s were standard-form, RESPA-required documents used by the Defendant Banks in the Plaintiffs' and Class Members' HOEPA mortgage loan transactions. These HUD-1 Settlement Statements uniformly concealed or misrepresented the disposition, nature or payment of proceeds to CBNV, GNBT or to the title companies, Title America or USA Title, or other affiliated entities, which payments, in fact, were going to the undisclosed Shumway Organization through its entities, Equity Plus, Equity Guaranty and others.

219.   Had Plaintiffs known that that the excessive and unlawful fees charged to them on their HOEPA mortgage loans were being used to funnel money to the Shumway Organization, Equity Plus, Equity Guaranty and their affiliated entities, they would have been unwilling to enter into their HOEPA mortgage loans and to pay such fees and charges. In order to make their scheme work, the racketeering activity was "self-concealing" and the enterprises had to conceal their racketeering activity from Plaintiffs.

220.   The Shumway Organization, CBNV  and Equity Plus and its affiliated entities formed one "enterprise" as defined by RICO, 18 U.S.C. § 1961(4).  This enterprise continued in existence from early 1998 to late 2002.

221.   Later, after their relationship with CBNV soured, the Shumway Organization, GNBT, and Equity Guaranty and its affiliated entities formed a second "enterprise" as defined by RICO, 18 U.S.C. § 1961(4).  This enterprise continued in existence from early 2000 to late 2002.

222.   In both instances, the enterprises consisted of a formal or informal association in fact of individuals and legal entities functioning as a continuing unit, and joined in purpose to solicit and make the HOEPA mortgage loans to the Plaintiffs.  The Shumway Organization, CBNV, and Equity Plus and later, the Shumway Organization, GNBT, and Equity Guaranty conspired together to conduct and then did, in fact, operate and conduct the enterprises, the activities of which affected interstate commerce.

223.    In the enterprises alleged above, the relationship among its participants was continuous, being defined in part by formal "consulting" agreements between the Banks and Equity Plus and Equity Guaranty.

224.    GMAC-RFC entered into "Client," "Broker/Lender," and "Consumer Finance Acquisition" agreements with CBNV and GNBT (or the Shumway Organization and Equity Plus and Equity Guaranty), that governed, in part, and defined the terms of the relationship between it and the banks (or the Shumway Organization and Equity Plus and Equity Guaranty).

225.    The Assignee-Defendants have a variety of trust, indenture and securitization agreements amongst themselves which govern their relationships.

226.    By the Shumway Organization's design, their "rent-a-bank-charter" scheme allowed them to manage and direct the affairs and conduct of the enterprises and Defendants' participation in the scheme.

227.    The enterprises engaged in a pattern of racketeering activity by committing a pattern of more than two predicate acts of mail fraud, wire fraud, and money laundering, each of which are indictable offenses, within a single ten year period, in violation of 18 U.S.C. §§ 1341, 1343 and 1956. The Defendants used the United States Postal Service, interstate couriers, and interstate wires for advancing, furthering and carrying out the scheme with specific intent to defraud Plaintiffs. Said predicate acts were related and pose a continuing threat of criminal activity. Indeed, the Shumway Organization is presently attempting to reincarnate itself as Calusa Investments in mortgage license proceeding presently under way in Virginia.

228.    Via their written and informal agreements (which may be inferred from their acts and conduct consistent with the existence of such a conspiracy) with the Defendant Banks, the Assignee-Defendants agreed to conduct and participate in the affairs of the enterprises and the commission of the predicate acts giving rise to RICO liability.

229.    The enterprises' and the Bank Defendants' and the Assignee-Defendants' scheme was designed to extract bogus fees and charges from the Plaintiffs and to funnel income generated by those bogus fees and charges to the Defendants and the participants in the enterprises. Because the fees and charges were included in the principal of the loans and interest was charged on the principal amount of the loans, Defendants were able to increase their income through the high rates of interest charged on the loans. This in turn made the loans more profitable to Defendants and thus more palatable to their investors, who bought interests in the Securitized Trusts or pools that they created to hold the second mortgage loans.

230.    The enterprises used the mails and private or commercial interstate carriers (eg. Federal Express) as a part of and in furtherance of their scheme or artifice to defraud the Plaintiffs in violation of 18 U.S.C. § 1341. That the mails and private or commercial interstate carriers were used as a part of the scheme is admitted in Line 1111 of each of the Plaintiffs' HUD-1s, wherein it is stated that the Defendant Banks charged their borrowers for "Overnight Fees."

231.    These Overnight Fees, as well as portions of the Section 800 Application Fees and Underwriting Fees, as well as the Section 1100 Title Charges were ultimately used to reimburse the Shumway Organization, Equity Plus and Equity Guaranty and their affiliated entities, and to provide an additional source of revenue to them, for the costs of their use of the mails and private or commercial interstate carriers to solicit business from potential borrowers, to send loan paperwork to and from the borrowers (which disseminated the fraudulent HUD-1 Settlement Statements and inaccurate TILA disclosures), to make disbursements to the Plaintiffs' creditors, to transfer original loan files from the enterprises and the Defendant Banks to GMAC-RFC and other Assignee-Defendants.

232.    Further, evidencing their participation in the scheme and their conspiratorial efforts to make the scheme work, Defendants used the mails to collect and receive the Plaintiffs' monthly loan payments.  As stated above, the bogus and unlawful fees and charges were added to the principal balance of the second mortgage loans, and interest was charged on the principal. As such, each monthly loan statement and related correspondence sent to the Plaintiffs, and each payment on the second mortgage loans by the Plaintiffs constituted a predicate act of mail fraud.

233.    The enterprises also used interstate wires as a part of and in furtherance of their scheme or artifice to defraud the Plaintiffs in violation of 18 U.S.C. § 1343.

234.    The enterprises used the interstate wires to market their second mortgage loan programs and to solicit loans from potential borrowers (through toll free phone numbers registered to Equity Plus and Equity Guaranty), to intake telephone applications for loans, to obtain through interstate wires credit reports on the borrowers (as evidenced by the charges for credit reports on Line 804 of the Plaintiffs' HUD-1s), to wire settlement funds, including the funds for the bogus and unlawful fees, between the banks and the title companies owned or controlled by Equity Plus and Equity Guaranty, to wire funds between GMAC-RFC and the Defendant Banks after the loans were purchased by GMAC-RFC and to disburse payments to the Plaintiffs' creditors.

235.    The enterprises also engaged in money laundering as a part of and in furtherance of their scheme or artifice to defraud the Plaintiffs in violation of 18 U.S.C. § 1956.

236.    The enterprises knew that that the property involved in the second mortgage loan transactions that they conducted with the Plaintiffs represented the proceeds of activities which constituted felonies under federal law (i.e., mail and wire fraud).

237.    The second mortgage loan transactions were "financial transactions" as defined by 18 U.S.C. § 1956(c)(4).

– 67 –

238.    The enterprises conducted the second mortgage loan transactions with the intent of carrying on, promoting and facilitating further acts of mail and wire fraud and/or knowing that the second mortgage loan transactions were designed in whole or in part to conceal or disguise the nature, source and control of the mail and wire fraud.

239.    Plaintiffs were in fact injured by Defendants' actions and the conduct constituting violations of RICO and suffered monetary damages as a result.  That the plaintiffs relied upon the predicate acts of mail and wire fraud and money laundering is evidenced by their agreement to enter into the second mortgage loan transactions with the Defendant Banks, their payment of fees and charges on their loans such as "Overnight fees", and the continued monthly payments on their second mortgage loans.

240.    As a direct, foreseeable and proximate result of the acts as alleged herein, and Defendants' violations of 18 U.S.C. §§ 1962(c) and 1962(d), Plaintiffs suffered substantial economic injury and injury to their property.

### Prayer for Relief

241.    WHEREFORE, on all asserted causes of action against Defendants and the Defendant Class members, Plaintiffs and the Plaintiff Class members pray for judgments against said Defendants as follows:

(a)    For an Order certifying that this action may be maintained as a Plaintiff class action, as defined above, under Fed. R. Civ. P. 23(a) and 23(b)(3);

(b)    For an Order appointing the Plaintiffs to act as representatives of the Plaintiff Class Members and the Plaintiff Class;

(c)    For an Order appointing the undersigned counsel to act as interim Plaintiff Class Counsel pursuant to Fed. R. Civ. P. 23 to act on behalf of the putative Plaintiff Class before the determination of whether to certify the Class under Fed. R. Civ. P. 23(b)(3) is made;

**CONSECO, INC.**
John R. Kline or his successor
Sr. Vice President
11825 North Pennsylvania Street
Carmel, Indiana, 46032

**MOREQUITY, INC.**
CSC Lawyers Incorporating Service
150 S. Perry Street
Montgomery, Alabama 36104

**COMMUNITY BANK OF NORTHERN VIRGINIA**
David P. Summers, or his successor
President and CEO
8150 Leesburg Pike
Vienna, Virginia 22182

This 30th day of August, 2004.

Michael Cartee, Esq. - No.CAR022
CARTEE & LLOYD
2210 Eighth Street
Tuscaloosa, AL  35401
(205) 759-1554
(205) 758-9477 (FAX)

COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

The undersigned counsel of record for the Plaintiffs does hereby certify having served the within and foregoing First Amended Class Action Complaint, Appendix of Exhibits thereto, and Motion for Leave to Amend Plaintiffs' Class Action Complaint, upon counsel, officers or registered agents as follows:

By hand delivery this date upon counsel for Irwin Union Bank and Trust Company:

> Wilson F. Green, Esq.
> Burr & Forman LLP
> Southtrust Tower
> 420 North Twentieth Street
> Birmingham, Alabama 35203

By first class certified mail, postage prepaid, return receipt requested as mailed by the Clerk of Court upon all other Defendants as follows:

> **HOUSEHOLD FINANCE, INC.**
> The Corporation Trust Company
> 1209 ORANGE STREET
> Wilmington, Delaware 19801

> **WILSHIRE FUNDING CORPORATION**
> CSC Lawyers Incorporating Service, Inc.
> 150 S. Perry St.
> Montgomery, Alabama 36104

> **RESIDENTIAL FUNDING CORPORATION**
> The Corporation Company
> 2000 Interstate Park
> Suite 204
> Montgomery, Alabama 36109

> **JP MORGAN CHASE BANK**
> The President or Managing Agent
> 4 New York Plaza
> 13th Floor
> New York, NY 10004

> **FAIRBANKS CAPITAL CORPORATION,**
> Thomas D Basmajian, CEO & Chairman
> 3815 South West Temple
> Salt Lake City, UT 84115

: KPF-276482

**NOTE**

October 9, 2000
*Date*

415 SUWANEE EAST DR., Lawrenceville, GA 30043
*City*          *State*          *Zip Code*
*Property Address*

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S.S **39,000.00** (This amount will be called "principal"), plus interest, to the order of the Lender. The Lender is **Guaranty National Bank of Tallahassee**

I understand that the lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note will be called the "Note Holder."

## 2. INTEREST

I will pay interest at a yearly rate of **14.990** %.

Interest will be charged on unpaid principal until the full amount of principal has been paid

## 3. PAYMENTS

I will pay principal and interest by making payments each month of U.S $ **499.22**

I will make my payments on the **13th** day of each month beginning on **November 13, 2000**. I will make these payments every month until I have paid all of the principal and interest and any other charges, described below, that I may owe under this Note. If on **October 13, 2025**, I still owe amounts under this Note, I will pay all those amounts, in full, on that date.

I will make my monthly payments at **11417 Sunset Hills Road, Ste 105 Reston, VA 20190** or at a different place if required by the Note Holder

## 4. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any of my monthly payments by the end of **10** calendar days after the date it is due, I will promptly pay a late charge to the Note Holder. The amount of the charge will be **5.000** % of my overdue payment, but not less than U.S. $ **N/A** and not more than U.S. $ **24.96**. I will pay this late charge only once on any late payment.

**(B) Notice From Note Holder**

If I do not pay the full amount of each monthly payment on time, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date I will be in default. That date must be at least 10 days after the date on which the notice is mailed to me or, if it is not mailed, 10 days after the date on which it is delivered to me.

**(C) Default**

If I do not pay the overdue amount by the date stated in the notice described in (B) above, I will be in default. If I am in default the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount.

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time

**(D) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back for all of its costs and expenses to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees.

## 5. THIS NOTE SECURED BY A DEED OF TRUST

In addition to the protections given to the Note Holder under this Note, a Deed of Trust, dated the same day as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Deed of Trust describes how and under what conditions I may be required to make immediate payment in full of all amounts that I owe under this Note.

Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Deed of Trust. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Deed of Trust.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Deed of Trust. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Deed of Trust without further notice or demand on Borrower

## 6. BORROWER'S PAYMENTS BEFORE THEY ARE DUE

I have the right to make payments of principal at any time before they are due but may be required to pay a prepayment charge. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in a letter that I am doing so. A prepayment of all of the unpaid principal is known as a "full prepayment". A prepayment of only part of the unpaid principal is known as a "partial prepayment".

If I make a full prepayment or a partial prepayment within **36 MONTHS** from the date of this Note, I will be required to pay a prepayment charge. This charge will be imposed on the amount of the prepayment that exceeds **twenty** percent ( **20** %) of the original principal amount of the Note in any twelve (12) month period. This charge will not exceed the amount equal to two percent (2%) on the amount prepaid in excess of **twenty** percent ( **20** %) of the original principal amount of this Note.

The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no delays in the due dates or changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes. If I choose to make a partial prepayment, the Note Holder may require me to make the prepayment on the same day that one of my monthly payments is due. The Note Holder may also require that the amount of my partial prepayment be equal to the amount of principal that would have been part of my next one or more monthly payments.

## 7. BORROWER'S WAIVERS

I waive my right to require the Note Holder to do certain things. Those things are: (A) to demand payment of amounts due (known as "presentment"); (B) to give notice that amounts due have not been paid (known as "notice of dishonor"); (C) to obtain an official certification of nonpayment (known as a "protest") Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder, if I fail to keep my promise under this Note, or who signs this Note to transfer it to someone else also waives these things. These persons are known as "guarantors, sureties and order sers."

## 8. GIVING OF NOTICES

Any notice that must be given to me under this Note will be given by delivering it or by mailing it by certified mail addressed to me at the Property Address above. A notice will be delivered or mailed to me at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by certified mail to the Note Holder at the address stated in Section 3 above. A notice will be mailed to the Note Holder at a different address if I am given a notice of that different address.

## 9. RESPONSIBILITY OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this Note. Any guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to do these things. The Note Holder may enforce its rights under this Note against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note. Any person who takes over the rights or obligations under this Note will have all of my rights and must keep all of my promises made in this Note. Any person who takes over the rights or obligations of a guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to keep all of the promises made in this Note.

**NOTICE TO BORROWER: Do not sign this Note if it contains blank spaces. All spaces should be completed before you sign.**

_____
JEROME R. ROBERTS          -Borrower

_____
-Borrower

_____
CHARRETTA L. ROBERTS          -Borrower

_____
-Borrower

*(Sign Original Only)*

**SECOND MORTGAGE - 8/92 - WITH PREPAYMENT PENALTY**

FF014 01/99

**EXHIBIT 17**

17

## DISCLOSURE REQUIRED BY THE FEDERAL TRUTH-IN-LENDING ACT
## AND THE FEDERAL RESERVE REGULATION Z
## FOR SECTION 226.32 MORTGAGES

Lender Name: Guaranty National Bank of Tallahassee          Date: October 9, 2000
11417 Sunset Hills Road, Ste 105
Reston, VA 20190

Re: KPF-276482

Borrower(s)   JEROME R. ROBERTS and CHARRETTA L. ROBERTS

Property Address: 415 SUWANEE EAST DR
Lawrenceville, GA 30043

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan.

The annual percentage rate on your loan will be   17.828 %.

Your regular  Monthly  payment will be $  499.22  .

☐  Your interest rate may increase.  Increases in the interest rate could increase your payment. The highest amount your payment could increase is to $   N/A   .

I/We acknowledge we have read and received, three business days prior to settlement, a copy of this disclosure statement.

| JEROME R. ROBERTS | Date | CHARRETTA L. ROBERTS | Date |
|---|---|---|---|
| | Date | | Date |
| | Date | | Date |
| | Date | | Date |

*LaserDoc (TM) by Delphi Information Sciences Corp.  EP017.0500*

EXHIBIT 16

16

# FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

| Creditor | Guaranty National Bank of Tallahassee<br>11417 Sunset Hills Road, Ste 105<br>Reston, VA 20190 | Borrower(s) | JEROME R. ROBERTS<br>CHARRETTA L. ROBERTS |
|---|---|---|---|

Loan Number KPF-276482
Doc. Preparation Date   October  9, 2000
Est. Settlement Date    October 13, 2000

Mailing Address   415 SUWANEE EAST DR
Lawrenceville, GA 30043

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. | Total Sale Price<br>The total cost of your purchase on credit, including your downpayment of |
|---|---|---|---|---|
| 17.828 % | $ 116,570.41 | $ 33,200.00 | $ 149,770.41 | $ N/A<br>$ N/A |

ITEMIZATION:  You have the right to receive at this time an itemization of the Amount Financed.

☐ I want an itemization.      ☐ I do not want an itemization.

☐ REQUIRED DEPOSIT:  The annual percentage rate does not take into account your required deposit.

Your payments will be   Monthly   beginning on date shown below.

| Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| 299 | 499.22 | 11/13/2000 | | | | | | |
| 1 | 503.63 | 10/13/2025 | | | | | | |

☒ DEMAND FEATURE:  This obligation has a demand feature.

☐ VARIABLE RATE:

INSURANCE:  You may obtain property/flood insurance from anyone you want that is acceptable to the creditor.  If you get insurance from the creditor you will pay $                     .  Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless you sign and agree to pay the additional cost.

| Type of Credit Insurance | Premium | (Signature) |
|---|---|---|
| | N/A | |

SECURITY:  You are giving a security interest in:   415 SUWANEE EAST DR, Lawrenceville, GA 30043

☐ The goods or property being purchased      ☒ Real Property you already own.

☐ _(brief description of other property)_

FILING FEES: $

LATE CHARGE:  If a payment is late, you will be charged   5.000  % of the payment.

PREPAYMENT:  If you pay off early, you

☒ may   ☐ will not   have to pay a penalty.

☐ may   ☒ will not   be entitled to a refund of part of the finance charge.

ASSUMPTION:  Someone buying your property

☐ may, subject to conditions   ☒ cannot   assume the remainder of your loan on the original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

☐ All dates and numerical disclosures except the late payment disclosures are estimates.   ☐ Construction Loan Disclosure

I/We acknowledge receiving and reading a copy of this disclosure.  I/We understand there is no commitment for the creditor to make this loan, and there is no obligation to me/us to accept this loan upon the delivery or signing of this disclosure.

| Borrower   JEROME R. ROBERTS | Date | Borrower   CHARRETTA L. ROBERTS | Date |
|---|---|---|---|
| Borrower | Date | Borrower | Date |

LaserDoc (TM) by Delphi Information Sciences Corp.  LDoc139.0497

**EXHIBIT 15**

15

**Settlement Statement**
Transactions without Sellers

| Name & Address of Borrower: | Name & Address of Lender: |
|---|---|
| JEROME R. ROBERTS and CHARRETTA L. ROBERTS<br><br>415 SUWANEE EAST DR, Lawrenceville, GA 30043 | Guaranty National Bank of Tallahassee<br>11417 Sunset Hills Road, Ste 105<br>Reston, VA 20190 |

| Property Location: (If different from address) | Settlement Agent:<br>TITLE AMERICA |
|---|---|
| 415 SUWANEE EAST DR<br>Lawrenceville, GA 30043 | Place of Settlement:<br>11417 SUNSET HILLS RD STE#105, Reston, VA 20190 |

| Loan Number:   KPF-276482 | Settlement Date:<br>October 9, 2000 | Disbursement Date:<br>October 13, 2000 |
|---|---|---|

| L. SETTLEMENT CHARGES | | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|---|
| **800** | **Items Payable in Connection with Loan** | | 1501. FIRST USA BANK N A | |
| 801. | Loan origination fee to GUARANTY NATIONAL BANK OF TALLAHASSEE | 3,900.00 | | 9,345.00 |
| 802. | Loan discount to GUARANTY NATIONAL BANK OF TALLAHASSEE | 780.00 | 1502. MBNA AMERICA BANK NA | |
| 803. | Appraisal fee to | | | 6,397.00 |
| 804. | Credit report to | | 1503. HHLD BANK | |
| 805. | Inspection fee to | | | 4,170.00 |
| 806. | Mortgage insurance application fee to | | 1504. DISCOVER FIN | |
| 807. | Application Fee to GUARANTY NATIONAL BANK OF TALLAHASSEE | 150.00 | | 4,122.00 |
| 808. | | | 1505. CITIBANK VISA | |
| 809. | | | | 3,845.00 |
| 810. | | | 1506. HRSUSA/BEST BUY | |
| 811. | Underwriting Fee to GUARANTY NATIONAL BANK OF TALLAHASSEE | 185.00 | | 2,550.00 |
| **900.** | **Items Required by Lender to be Paid in Advance** | | 1507. AGFC AMERICHARGE | |
| 901. | | | | 1,132.00 |
| | | | 1508. CHASE | |
| 902. | Mortgage insurance premium for        months to | | | 795.00 |
| | | | 1509. | |
| 903. | | | | |
| 904. | | | 1510. | |
| **1000.** | **Reserves Deposited with Lender** | | | |
| 1001. | Hazard insurance        mos. @ $        per mo. | | 1511. | |
| 1002. | Mortgage insurance        mos. @ $        per mo. | | | |
| 1003. | City property taxes        mos. @ $        per mo. | | 1512. | |
| 1004. | Cnty. property taxes        mos. @ $        per mo. | | | |
| 1005. | Annual assessments        mos. @ $        per mo. | | 1513. | |
| 1006. | mos. @ $        per mo. | | | |
| 1007. | mos. @ $        per mo. | | 1514. | |
| 1008. | mos. @ $        per mo. | | | |
| 1099. | | | 1515. | |
| **1100.** | **Title Charges** | | | |
| 1101. | Settlement or closing fee to TITLE AMERICA, LLC | 250.00 | 1520 **TOTAL DISBURSED** | |
| 1102. | Abstract or title search to TITLE AMERICA, LLC | 106.00 | (Enter on line 1603) | 32,356.00 |
| 1103. | Title examination to TITLE AMERICA, LLC | 300.00 | | |
| 1104. | Title insurance binder to | | | |
| 1105. | Document preparation to | | | |
| 1106. | Notary fees to | | | |
| 1107. | Attorneys' fees to<br>(includes above item number s        ) | | | |
| 1108. | Title insurance to<br>(includes above item number s        ) | | | |
| 1109. | Lender's coverage $ | | **N. NET SETTLEMENT** | |
| 1110. | Owners Coverage $ | | 1600. Loan Amount | 39,000.00 |
| 1111. | Overnight Fee to TITLE AMERICA, LLC | 25.00 | | |
| 1112. | Document Review to TITLE AMERICA, LLC | 260.00 | 1601. Plus Cash/Check from Borrower | |
| 1113. | Processing Fee to TITLE AMERICA, LLC | 250.00 | | |
| **1200** | **Government Recording and Transfer Charges** | | 1602. Minus Total Settlement Charges (line 1400) | 6,343.00 |
| 1201. | Recording Fees to GUINNETT COUNTY CLERK OF THE SUPERIOR CT | 137.00 | 1603. Minus Total Disbursements to Others (line 1520) | 32,356.00 |
| 1202. | | | | |
| 1203. | | | 1604. Equals Disbursements to Borrower (after expiration of any applicable rescission period required by law) | 301.00 |
| 1204. | | | | |
| 1205. | | | | |
| **1400.** | **Total Settlement Charges (enter on line 1602)** | 6,343.00 | | |

**EXHIBIT 14**

14

## DISCLOSURE REQUIRED BY THE FEDERAL TRUTH-IN-LENDING ACT
## AND THE FEDERAL RESERVE REGULATION Z
## FOR SECTION 226.32 MORTGAGES

Lender Name: COMMUNITY BANK OF NORTHERN VIRGINIA
11000 BROKEN LAND PKW.
Columbia, MD 21044

Date:   February  2, 2001

Re:  23KA148394

Borrower(s)   KATHY M. NIXON and JOHN A. NIXON JR

Property Address: 6701 HIBISCUS LANE
NORTHPORT, AL 35473-1864

---

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application.  If you obtain this loan, the lender will have a mortgage on your home.  You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan.

The annual percentage rate on your loan will be  20.261 %.

Your regular   Monthly   payment will be $ 768.71 .

☐ Your interest rate may increase.  Increases in the interest rate could increase your payment. The highest amount your payment could increase is to $ N/A  .

---

I/We acknowledge we have read and received a copy of this disclosure statement at least three (3) business days prior to closing.

| | |
|---|---|
| KATHY M. NIXON                                  Date | JOHN A. NIXON JR                                  Date |
| _____ Date | _____ Date |
| _____ Date | _____ Date |
| _____ Date | _____ Date |

EXHIBIT 13

13

COMMUNITY BANK OF NORTHERN VIRGINIA

Creditor 11000 BROKEN LAND PKW.
Columbia, MD 21044

Borrower(s) KATHY M. NIXON
JOHN A. NIXON JR

| | |
|---|---|
| Loan Number | 23KA148394 |
| Doc. Preparation Date | February 2, 2001 |
| Est Settlement Date | February 8, 2001 |

Mailing Address: 6701 HIBISCUS LANE
NORTHPORT, AL 35473-1864

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. | Total Sale Price<br>The total cost of your purchase on credit, including your downpayment of |
|---|---|---|---|---|
| | | | | $ N/A |
| 20.261 % | $ 185,347.31 | $ 45,229.08 | $ 230,576.39 | $ N/A |

ITEMIZATION: You have the right to receive at this time an itemization of the Amount Financed.
☐ I want an itemization.   ☐ I do not want an itemization.
☐ REQUIRED DEPOSIT: The annual percentage rate does not take into account your required deposit.
Your payments will be **Monthly** beginning on date shown below.

| Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| 299 | 768.71 | 03/08/2001 | | | | | | |
| 1 | 732.10 | 02/08/2026 | | | | | | |

☐ DEMAND FEATURE: This obligation has a demand feature.

☐ VARIABLE RATE:

INSURANCE: You may obtain property/flood insurance from anyone you want that is acceptable to the creditor. If you get insurance from the creditor you will pay $           . Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless you sign and agree to pay the additional cost.

| Type of Credit Insurance | Premium | (Signature) |
|---|---|---|
| | N/A | |

SECURITY: You are giving a security interest in:   6701 HIBISCUS LANE, NORTHPORT, AL 35473-1864
☐ The goods or property being purchased   ☒ Real Property you already own.

(brief description of other property)
FILING FEES: $
LATE CHARGE: If a payment is late, you will be charged   5.000 % of the payment.
PREPAYMENT: If you pay off early, you
☒ may   ☐ will not   have to pay a penalty.
☐ may   ☒ will not   be entitled to a refund of part of the finance charge.
ASSUMPTION: Someone buying your property
☐ may, subject to conditions   ☒ cannot   assume the remainder of your loan on the original terms.
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.
☐ All dates and numerical disclosures except the late payment disclosures are estimates.   ☐ Construction Loan Disclosure
I/We acknowledge receiving and reading a copy of this disclosure. I/We understand there is no commitment for the creditor to make this loan, and there is no obligation to me/us to accept this loan upon the delivery or signing of this disclosure.

| Borrower | KATHY M. NIXON | Date | Borrower | JOHN A. NIXON JR | Date |
|---|---|---|---|---|---|

| Borrower | Date | Borrower | Date |
|---|---|---|---|

**EXHIBIT 12**

LaserDoc (TM) by Delphi Information Sciences Corp  LDoc139 04/97

12

Settlement Statement U.S. Department of Housing and Urban Development     OMB Approval No. 2502-0491
Transactions without Sellers

| Name & Address of Borrower: | Name & Address of Lender: |
|---|---|
| KATHY M NIXON and JOHN A NIXON JR | COMMUNITY BANK OF NORTHERN VIRGINIA |
| 6701 HIBISCUS LANE, NORTHPORT, AL 35473-1864 | 107 FREE CT |
| | Sterling, VA 20164 |

| Property Location: (If different from address) | Settlement Agent: |
|---|---|
| | PARAMOUNT TITLE |
| 6701 HIBISCUS LANE | Place of Settlement: |
| NORTHPORT, AL 35473-1864 | 1534 14TH STREET NW, WASHINGTON, DC 20009 |

| Loan Number: | Settlement Date: | Disbursement Date |
|---|---|---|
| 23KA148394 | February 2, 2001 | February 8, 2001 |

| L. SETTLEMENT CHARGES | | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|---|
| **800** | **Items Payable in Connection with Loan** | | 1501. CITIFINANCIAL | 15,914 36 |
| 801 | Loan origination fee to COMMUNITY BANK OF NORTHERN VIRGINIA | 3,999 92 | 1502. MBNA AMERICA BANK NA | 8,131 00 |
| 802. | Loan discount to | | 1503. CITIFINANCIA | 3,643 00 |
| 803. | Appraisal fee to L GRANT MANN (POC/BORR $175.00) | | 1504. MBNA AMERICA BANK NA | 2,857 00 |
| 804 | Credit report to | | |  |
| 805 | Application Fee CBNV to COMMUNITY BANK OF NORTHERN VIRG | 275 00 | 1505. PROVIDIAN FINANCIAL | 2,539 00 |
| 806. | Mortgage insurance application fee to | | |  |
| 807 | | | |  |
| 808 | | | 1506 CROSS COUNTRY BANK | 1,895 00 |
| 809 | | | |  |
| 810. | Underwriting Fee CBNV to COMMUNITY BANK OF NORTHERN VIRGINIA | 295 00 | 1507. AMERICAN EXP | 1,778 00 |
| 811. | Document Review Fee CBNV to COMMUNITY BANK OF NORTHERN VIRGINIA | 150 00 | |  |
| **900.** | **Items Required by Lender to be Paid in Advance** | | 1508. CAPITAL ONE BANK | 1,560 00 |
| 901. | | | |  |
| | | | 1509 TUSC TCHR CU | 1,301 00 |
| 902 | Mortgage insurance premium for months to | | |  |
| 903. | | | 1510. | |
| 904. | | | |  |
| **1000.** | **Reserves Deposited with Lender** | | 1511. | |
| 1001. | Hazard insurance mos. @ $ per mo. | | |  |
| 1002. | Mortgage insurance mos. @ $ per mo. | | 1512. | |
| 1003 | City property taxes mos. @ $ per mo. | | |  |
| 1004 | Cnty. property taxes mos. @ $ per mo. | | 1513. | |
| 1005 | Annual assessments mos. @ $ per mo. | | |  |
| 1006. | mos. @ $ per mo. | | 1514. | |
| 1007 | mos. @ $ per mo. | | |  |
| 1008. | mos. @ $ per mo. | | 1515 | |
| 1099. | | | |  |
| **1100.** | **Title Charges** | | 1520 **TOTAL DISBURSED** | 39,658 36 |
| 1101. | Settlement or closing fee to PARAMOUNT TITLE | 50.00 | (Enter on line 1603) |  |
| 1102. | Abstract or title search to GAC | 260.00 | |  |
| 1103. | Title examination to PARAMOUNT TITLE | 595 00 | |  |
| 1104 | Title insurance binder to | | |  |
| 1105 | Document preparation to PARAMOUNT TITLE | 175.00 | |  |
| 1106. | Notary fees to | | |  |
| 1107. | Attorneys' fees to (includes above item numbers ) | | |  |
| 1108. | Title insurance to (includes above item numbers ) | | |  |
| 1109. | Lender's coverage $ | | **N. NET SETTLEMENT** | |
| 1110 | Owners Coverage $ | | 1600. Loan Amount | 49,999 00 |
| 1111 | | | |  |
| 1112 | | | 1601. Plus Cash/Check from Borrower | |
| 1113. | | | |  |
| **1200** | **Government Recording and Transfer Charges** | | 1602. Minus Total Settlement Charges (line 1400) | 5,983 91 |
| 1201. | Recording Fees to CLERK OF THE COURT | 109.00 | |  |
| 1202 | | | 1603. Minus Total Disbursements to Others (line 1520) | 39,658 36 |
| 1203. | MORTGAGE TAX to CLERK OF THE COURT | 74.99 | |  |
| 1204 | | | 1604. Equals Disbursements to Borrower (after expiration of any applicable rescission period required by law) | 4,356 73 |
| 1205. | | | |  |
| **1300** | **Additional Settlement Charges** | | Borrower(s) Signature(s) | |
| 1301. | Survey to | | |  |
| 1302. | Pest inspection to | | X |  |
| 1303 | | | KATHY M. NIXON |  |
| 1304 | | | |  |
| 1305 | | | X |  |
| 1306 | | | |  |
| 1307 | | | JOHN A. NIXON JR |  |
| **1400** | **Total Settlement Charges (enter on line 1602)** | 5,983 91 | |  |

**EXHIBIT 11**

SAC-276400

# NOTE

September 27, 2000
Date                                                                    City                    State

3736 PATTI PKWY, Decatur, GA 30034-4899
Property Address                          City          State          Zip Code

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 51,600.00
(This amount will be called "principal"), plus interest, to the order of the Lender. The Lender is **Guaranty National Bank of Tallahassee**

. I understand that the lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note will be called the "Note Holder."

## 2. INTEREST

I will pay interest at a yearly rate of   13.990 %.
Interest will be charged on unpaid principal until the full amount of principal has been paid.

## 3. PAYMENTS

I will pay principal and interest by making payments each month of U.S. $ 641.28
I will make my payments on the   3rd   day of each month beginning on November 3, 2000   . I will make these payments every month until I have paid all of the principal and interest and any other charges, described below, that I may owe under this Note. If, on October 3, 2020, I still owe amounts under this Note, I will pay all those amounts, in full, on that date.
I will make my monthly payments at 11417 Sunset Hills Road, Ste 105 Reston, VA 20190
or at a different place if required by the Note Holder.

## 4. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A)  Late Charge for Overdue Payments**
If the Note Holder has not received the full amount of any of my monthly payments by the end of   10   calendar days after the date it is due, I will promptly pay a late charge to the Note Holder. The amount of the charge will be   5.000 % of my overdue payment, but not less than U.S. $ N/A   and not more than U.S. $ 32.06   . I will pay this late charge only once on any late payment.

**(B)  Notice From Note Holder**
If I do not pay the full amount of each monthly payment on time, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date I will be in default. That date must be at least 10 days after the date on which the notice is mailed to me or, if it is not mailed, 10 days after the date on which it is delivered to me.

**(C)  Default**
If I do not pay the overdue amount by the date stated in the notice described in (B) above, I will be in default. If I am in default the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount.
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(D)  Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back for all of its costs and expenses to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees.

## 5. THIS NOTE SECURED BY A DEED OF TRUST

In addition to the protections given to the Note Holder under this Note, a Deed of Trust, dated the same day as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Deed of Trust describes how and under what conditions I may be required to make immediate payment in full of all amounts that I owe under this Note.
Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Deed of Trust. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Deed of Trust.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Deed of Trust. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Deed of Trust without further notice or demand on Borrower.

## 6. BORROWER'S PAYMENTS BEFORE THEY ARE DUE

I have the right to make payments of principal at any time before they are due; this may be required to pay a prepayment charge. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in a letter that I am doing so. A prepayment of all of the unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

If I make a full prepayment or a partial prepayment within   36 MONTHS   from the date of this Note, I will be required to pay a prepayment charge. This charge will be imposed on the amount of the prepayment that exceeds   twenty   percent (  20 %) of the original principal amount of the Note in any twelve (12) month period. This charge will not exceed the amount equal to two percent (2%) on the amount prepaid in excess of twenty   percent (  20 %) of the original principal amount of this Note.

The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no delays in the due dates or changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes. If I choose to make a partial prepayment, the Note Holder may require me to make the prepayment on the same day that one of my monthly payments is due. The Note Holder may also require that the amount of my partial prepayment be equal to the amount of principal that would have been part of my next one or more monthly payments.

## 7. BORROWER'S WAIVERS

I waive my right to require the Note Holder to do certain things. Those things are: (A) to demand payment of amounts due (known as "presentment"); (B) to give notice that amounts due have not been paid (known as "notice of dishonor"); (C) to obtain an official certification of nonpayment (known as a "protest"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder if I fail to keep my promise under this Note, or who signs this Note to transfer it to someone else also waives these rights. These persons are known as "guarantors, sureties and endorsers."

## 8. GIVING OF NOTICES

Any notice that must be given to me under this Note will be given by delivering it or by mailing it by certified mail addressed to me at the Property Address above. A notice will be delivered or mailed to me at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by certified mail to the Note Holder at the address stated in Section 3 above. A notice will be mailed to the Note Holder at a different address if I am given a notice of that different address.

## 9. RESPONSIBILITY OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this Note. Any guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to do these things. The Note Holder may enforce its rights under this Note against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note. Any person who takes over the rights or obligations under this Note will have all of my rights and must keep all of my promises made in this Note. Any person who takes over the rights or obligations of a guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to keep all of the promises made in this Note.

**NOTICE TO BORROWER: Do not sign this Note if it contains blank spaces.  All spaces should be completed before you sign.**

*Rosa Hill.*

**EXHIBIT 10**

10

## DISCLOSURE REQUIRED BY THE FEDERAL TRUTH-IN-LENDING ACT AND THE FEDERAL RESERVE REGULATION Z FOR SECTION 226.32 MORTGAGES

Lender Name: Guaranty National Bank of Tallahassee
11417 Sunset Hills Road, Ste 105
Reston, VA 20190

Date: September 27, 2000

Borrower(s)   ROSA KELLY

Re:   SAC-276400

Property Address. 3736 PATTI PKWY
Decatur, GA 30034-4899

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan.

The annual percentage rate on your loan will be   16.532 %.

Your regular   Monthly   payment will be $  641.28

☐ Your interest rate may increase. Increases in the interest rate could increase your payment. The highest amount your payment could increase is to $   N/A

I/We acknowledge we have read and received, three business days prior to settlement, a copy of this disclosure statement.

| | |
|---|---|
| *Rosa Kelly* | |
| ROSA KELLY                                    Date | Date |
| _____        Date | _____        Date |
| _____        Date | _____        Date |
| _____        Date | _____        Date |

LaserDoc (TM) by Delphi Information Sciences Corp. EH017.0500

**EXHIBIT 9**

9

# FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

| Creditor | Guaranty National Bank of Tallahassee 11417 Sunset Hills Road, Ste 105 Reston, VA 20190 | Borrower(s) | ROSA KELLY |

Loan Number SAC-276400
Doc. Preparation Date    September 27, 2000
Est. Settlement Date     October 3, 2000

Mailing Address    3736 PATTI PKWY
Decatur, GA 30034-4899

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your downpayment of |
|---|---|---|---|---|
| 16.532 % | $ 109,105.81 | $ 44,804.00 | $ 153,909.81 | $ N/A $ N/A |

ITEMIZATION: You have the right to receive at this time an itemization of the Amount Financed.
[ ] I want an itemization.    [ ] I do not want an itemization.
[ ] REQUIRED DEPOSIT: The annual percentage rate does not take into account your required deposit.
Your payments will be    **Monthly**    beginning on date shown below.

| Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| 239 | 641.28 | 11/03/2000 | | | | | | |
| 1 | 643.89 | 10/03/2020 | | | | | | |

[X] DEMAND FEATURE: This obligation has a demand feature.
[ ] VARIABLE RATE:

INSURANCE: You may obtain property/flood insurance from anyone you want that is acceptable to the creditor. If you get insurance from the creditor you will pay  $            . Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless you sign and agree to pay the additional cost.

| Type of Credit Insurance | Premium | (Signature) |
|---|---|---|
| | N/A | |

SECURITY: You are giving a security interest in: 3736 PATTI PKWY, Decatur, GA 30034-4899
[ ] The goods or property being purchased    [X] Real Property you already own.

(brief description of other property)

FILING FEES: $
LATE CHARGE: If a payment is late, you will be charged    5.000  % of the payment.
PREPAYMENT: If you pay off early, you
[X] may    [ ] will not    have to pay a penalty.
[ ] may    [X] will not    be entitled to a refund of part of the finance charge.
ASSUMPTION: Someone buying your property
[ ] may, subject to conditions    [X] cannot    assume the remainder of your loan on the original terms.
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.
[ ] All dates and numerical disclosures except the late payment disclosures are estimates.    [ ] Construction Loan Disclosure
I/We acknowledge receiving and reading a copy of this disclosure. I/We understand there is no commitment for the creditor to make this loan, and there is no obligation to me/us to accept this loan upon the delivery or signing of this disclosure.

Borrower    ROSA KELLY                           Date            Borrower                                   Date

Borrower                                          Date            Borrower                                   Date

LaserDoc (TIL) by Delphi Information Sciences Corp. LDoc129.0497

**EXHIBIT 8**

8

# Settlement Statement
Transactions account in

| Name & Address of Borrower | Name & Address of Lender: |
|---|---|
| ROSA KELLY<br><br>3736 PATTI PKWY, Decatur, GA 30034-4899 | Guaranty National Bank of Tallahassee<br>11417 Sunset Hills Road, Ste 105<br>Reston, VA 20190 |

| Property Location (If different from address) | Settlement Agent:<br>TITLE AMERICA |
|---|---|
| 3736 PATTI PKWY<br>Decatur, GA 30034-4899 | Place of Settlement:<br>11417 SUNSET HILLS RD STE#105, Reston, VA 20190 |

| Loan Number:<br>SAC-276400 | Settlement Date:<br>September 27, 2000 | Disbursement Date:<br>October 3, 2000 |
|---|---|---|

| | L. SETTLEMENT CHARGES | | | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|---|---|---|
| 800 | Items Payable in Connection with Loan | | | 1501. | THE MONEY STORE | |
| 801. | Loan origination fee to GUARANTY NATIONAL BANK OF TALLAHASSEE | 5,160.00 | | | | 24,766.58 |
| 802. | Loan discount to GUARANTY NATIONAL BANK OF TALLAHASSEE | 516.00 | | 1502. | BANK OF AMERICA | |
| 803. | Appraisal fee to | | | | | 9,341.54 |
| 804. | Credit report to | | | 1503. | NEXTCARD | |
| 805. | Inspection fee to | | | | | 5,232.12 |
| 806. | Mortgage Insurance application fee to | | | 1504. | USAA FSB | |
| 807 | Application Fee to GUARANTY NATIONAL BANK OF TALLAHASSEE | 150.00 | | | | 2,453.00 |
| 808 | | | | 1505. | ASSOC INVESTMENT CORP | |
| 809. | | | | | | 807.59 |
| 810. | | | | 1506. | WFNNB/VCTRIA | |
| 811. | Underwriting Fee to GUARANTY NATIONAL BANK OF TALLAHASSEE | 185.00 | | | | 245.47 |
| 900. | Items Required by Lender to be Paid in Advance | | | 1507. | | |
| 901. | | | | | | |
| | | | | 1508. | | |
| 902. | Mortgage insurance premium for         months to | | | | | |
| | | | | 1509. | | |
| 903. | | | | | | |
| 904. | | | | 1510. | | |
| 1000. | Reserves Deposited with Lender | | | | | |
| 1001. | Hazard insurance | mos. @ $     per mo. | | 1511. | | |
| 1002. | Mortgage insurance | mos. @ $     per mo. | | | | |
| 1003. | City property taxes | mos. @ $     per mo. | | 1512. | | |
| 1004. | Cnty. property taxes | mos. @ $     per mo. | | | | |
| 1005. | Annual assessments | mos. @ $     per mo. | | 1513. | | |
| 1006. | | mos. @ $     per mo. | | | | |
| 1007. | | mos. @ $     per mo. | | 1514. | | |
| 1008 | | mos. @ $     per mo. | | | | |
| 1099. | | | | 1515. | | |
| 1100. | Title Charges | | | | | |
| 1101. | Settlement or closing fee to TITLE AMERICA, LLC | 250.00 | | 1520 | TOTAL DISBURSED | |
| 1102. | Abstract or title search to TITLE AMERICA, LLC | 106.00 | | | (Enter on line 1603) | 42,846.30 |
| 1103. | Title examination to TITLE AMERICA, LLC | 300.00 | | | | |
| 1104. | Title insurance binder to | | | | | |
| 1105. | Document preparation to | | | | | |
| 1106. | Notary fees to | | | | | |
| 1107. | Attorney's fees to<br>(includes above item numbers     ) | | | | | |
| 1108. | Title insurance to<br>(includes above item numbers     ) | | | | | |
| 1109. | Lender's coverage $ | | | | N. NET SETTLEMENT | |
| 1110. | Owner's Coverage $ | | | 1600. | Loan Amount | 51,600.00 |
| 1111. | Overnight Fee to TITLE AMERICA, LLC | 25.00 | | | | |
| 1112. | Document Review Fee to TITLE AMERICA, LLC | 260.00 | | 1601. | Plus Cash/Check from Borrower | |
| 1113. | Processing Fee to TITLE AMERICA, LLC | 250.00 | | | | |
| 1200. | Government Recording and Transfer Charges | | | 1602. | Minus Total Settlement Charges (line 1400) | 7,376.50 |
| 1201. | Recording Fees to DE KALB COUNTY CLERK OF THE SUPERIOR COU | 176.50 | | | | |
| 1202. | | | | 1603. | Minus Total Disbursements to Other's (line 1520) | 42,846.30 |
| 1203. | | | | | | |
| 1204 | | | | 1604. | Equals Disbursements to Borrower (after expiration of any applicable rescission period required by law) | 1,377.20 |
| 1205. | | | | | | |
| 1400. | Total Settlement Charges (enter on line 1602) | 7,376.50 | | | | |

| Borrower's Signature<br>ROSA KELLY | Borrower's Signature |
|---|---|

| Borrower's Signature | Borrower's Signature |
|---|---|

**EXHIBIT 7**

7

**NOTE**

May 02, 2001
CHANTILLY, Virginia

PROPERTY ADDRESS:   3705 DEARING DOWNS DRIVE
                    TUSCALOOSA, AL 35405

App No. CHAN-01-0001886

**1.   BORROWER'S PROMISE TO PAY:**   In return for a loan that I have received, I promise to pay U.S.   **$55,500.00**   (this amount will be called "principal"), plus interest, to the order of the Lender.  The Lender is
**COMMUNITY BANK OF NORTHERN VIRGINIA**
I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note will be called the "Note Holder."

**2.   INTEREST:**   I will pay interest at a yearly rate of **17.750** %.  Interest will be charged on unpaid principal until the full amount of principal has been paid.

**3.   PAYMENTS:**   I will pay principal and interest by making payments each month of U.S.   **$845.87** .   I will make my payments on the **7th**  day of each month beginning on   **June 07, 2001** .   I will make these payments every month until I have paid all of the principal and interest and any other charges, described below, that I may owe under this Note.  If, on   **May 07, 2021** , I still owe amounts under this Note, I will pay all those amounts, in full, on that date.
I will make my monthly payments at
**14555 AVION PARKWAY, SUITE 150**
or at a different place if required by the Note Holder.   **CHANTILLY, VA 20151-**

**4.  BORROWER'S FAILURE TO PAY AS REQUIRED:**
**(a)   Late Charge for Overdue Payments:  If the Note Holder has not received the full amount of any of my monthly payments by the end of  15 calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be      5.0   % of my overdue payment, but not less than U.S.      N/A     and not more than U.S.      $10.00 .  I will pay this late charge only once on any late payment.
(b)   Notice From Note Holder:**  If I do not pay the full amount of each monthly payment on time, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date I will be in default.  That date must be at least 10 days after the date on which the notice is mailed to me or, if it is not mailed, 10 days after the date on which it is delivered to me.
**(c)   Default:**  If I do not pay the overdue amount by the date stated in the notice described in (b) above, I will be in default.  If I am in default, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount.  Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.
**(d)   Payment of Note Holder's Costs and Expenses:**   If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back for all of its reasonable costs and expenses to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

**5.  THIS NOTE SECURED BY A MORTGAGE:**
In addition to the protections given to the Note Holder under this Note, a Mortgage, dated      **May 02, 2001** , protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.  That Mortgage describes how and under what conditions I may be required to make immediate payment in full of all amounts that I owe under this Note.

**6.  BORROWER'S PAYMENTS BEFORE THEY ARE DUE:**   I have the right to make payments of principal at any time before they are due.  A payment of principal only is known as a "prepayment."  When I make a prepayment, I will tell the Note Holder in a letter that I am doing so.  A prepayment of all of the unpaid principal is known as a "full prepayment."  A prepayment of only part of the unpaid principal is known as a "partial prepayment."
I may make a full or partial prepayment; however, the Note Holder may charge me for the privilege of prepayment.  If more than 20% of the original principal amount of this Note is prepaid in any 12-month period within   **3**   years after the date of this loan, I agree to pay a prepayment charge equal to   **6**   months interest on the amount prepaid which is in excess of 20% of the original principal amount of this Note.  If I make a Partial Prepayment, there will be no delays in the due dates or changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes.

**7.  BORROWER'S WAIVERS:**   I waive my rights to require the Note Holder to do certain things.  Those things are: (A) to demand payment of amounts due (known as "presentment"); (B) to give notice that amounts due have not been paid (known as "notice of dishonor"); (C) to obtain an official certification of nonpayment (known as a "protest").  Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder if I fail to keep my promises under this Note, or who signs this Note to transfer it to someone else also waives these rights.  These persons are known as "guarantors, sureties and endorsers."

**8.   GIVING OF NOTICES:**   Any notice that must be given to me under this Note will be given by delivering it or by mailing it by certified mail addressed to me at the Property Address above.  A notice will be delivered or mailed to me at a different address if I give the Note Holder a notice of my different address.
Any notice that must be given to the Note Holder under this Note will be given by mailing it by certified mail to the Note Holder at the address stated in Section 3 above.  A notice will be mailed to the Note Holder at a different address if I am given a notice of that different address.

**9.   RESPONSIBILITY OF PERSONS UNDER THIS NOTE:**   If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this Note.  Any guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to do these things.  The Note Holder may enforce its rights under this Note against each of us individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.  Any person who takes over my rights or obligations under this Note will have all of my rights and must keep all of my promises made in this Note.  Any person who takes over  the rights or obligations of a guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to keep all of the promises made in this Note.

NOTICE TO BORROWER: Do not sign this Note if it contains blank spaces.  All spaces should be completed before you sign.

**CAUTION:  IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS NOTE BEFORE YOU SIGN IT.**

X _____          X _____
   CLELL L. HOBSON

                                                          **EXHIBIT 6**

X _____          X _____

(Sign Original Only)

ALABAMA - Second Mortgage - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT - Form 3901

Management Systems Development, Inc.  (800) 984-060   *Loan Energizer!™*      #AL_NOTEP(4/13/99typ)      Copyright (c) 1994

6

**COMMUNITY BANK OF NORTHERN VIRGINIA**

App No.  CHAN-01-0001886

14555 AVION PARKWAY, SUITE 150
CHANTILLY, VA 20151-
TEL: (703)263-2280
FAX: (703)421-1521

# LOAN APPLICATION RECEIPT
## & BORROWER NOTICE

Mailing Address —————————— Requested Loan Terms

**CLELL L. HOBSON**

**3705 DEARING DOWNS DRIVE**
**TUSCALOOSA, AL 35405**

| | | | |
|---|---|---|---|
| Loan Amount: | $55,500.00 | P & I: | $845.87 |
| Interest Rate: | 17.750 % | FHA MI: | $0.00 |
| Term (years): | 20 | Total: | $845.87 |

Dear Borrower(s):

We would like to thank you for applying for a loan with us, and have begun processing your application. We look forward to providing you a speedy answer.

Please feel free to contact us should you have any questions regarding your loan application.

We value your confidence in our firm, and very much look forward to serving you again in the future--as well as any referrals with whom you would like us to work.

Thanks again for your business.

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan.

The Annual Percentage Rate ("APR") on your loan will be: ___**19.904**___ %

Your regular monthly payment will be: ___**$845.87**___

Your interest rate will be a fixed rate.

**I/We hereby acknowledge receipt of our High Cost Mortgage Disclosure 3 days prior to closing.**

X _____
**CLELL L. HOBSON**                    Date

X _____
                                       Date

X _____
                                       Date

X _____
                                       Date

**EXHIBIT 5**

5

# TRUTH-IN-LENDING DISCLOSURE STATEMENT

**COMMUNITY BANK OF NORTHERN VIRGINIA**

App No. CHAN-01-0001886

14555 AVION PARKWAY, SUITE 150
CHANTILLY, VA 20151-
TEL: (703)263-2280

05/02/2001

| Annual Percentage Rate | Finance Charge | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| **19.904 %** | **$152,996.30** | **$50,012.50** | **$203,008.80** |

Your payment schedule will be:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 240 | $845.87 | Monthly, beginning: **June 07, 2001** |

DEMAND FEATURE: [X] This loan does not have a demand feature. [ ] This loan has a demand feature.

VARIABLE RATE FEATURE: [X] This loan does not have a variable rate feature. [ ] This loan has a variable rate feature.

INSURANCE: The following insurance is required to obtain credit:
[ ] Credit life insurance and credit disability [X] Property insurance [ ] Flood Insurance
You may obtain property insurance from any insurer that is acceptable to the lender.

SECURITY: You are giving a security interest in the real property located at: **3705 DEARING DOWNS DRIVE TUSCALOOSA, AL 35405**

FILING FEES: **$45.00**

LATE CHARGE: If a payment is more than **15** days late, you will be charged **5.0** % of the payment, but not less than U.S. **N/A** and not more than U.S. **$10.00** .

PREPAYMENT: If you pay off early, you
[X] may [ ] will not have to pay a penalty.
[ ] may [X] will not be entitled to a refund of part of the finance charge.

ASSUMPTION: Someone buying your property
[ ] may [ ] may, subject to conditions [X] may not assume the remainder of your loan on the original terms:

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.
[ ] If checked, all dates and numerical disclosures except the late payment disclosures are estimates.

Neither you nor the creditor previously has become obligated to make or accept this loan, nor is any such obligation made by the delivery or signing of this disclosure.

I/we have read this Statement, and understand its contents:

DATE:_____

X_____
    CLELL L. HOBSON

X_____

X_____

X_____

**EXHIBIT 4**

NOTE: Payments shown above do not include reserve deposits for taxes, assessments, and property or flood insurance.

Management Systems Development, Inc. (213) 954-7600     *Loan Energizer!*™     #REGZ_E2(1/30/98co.nm/date)     Copyright (c) 1994-96

4

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT    SETTLEMENT STATEMENT          PAGE 2

| L. SETTLEMENT CHARGES: | | FILE #: RT016413 | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|---|
| 700. TOTAL SALES/BROKER'S COMMISSION based on price $ | | @ | = | | |
| Division of commission (line 700) as follows: | | | | | |
| 701. $ | to | | | | |
| 702. $ | to | | | | |
| 703. Commission paid at Settlement | | | | | |
| 704. | | | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | | | |
| 801. Loan Origination Fee | % | Community Bank of Northern Virginia | | 2,497.60 | |
| 802. Loan Discount | % | Community Bank of Northern Virginia | | 2,220.00 | |
| 803. Appraisal Fee | to | | | | |
| 804. Credit Report | to | | | | |
| 805. Lender's Inspection Fee | to | | | | |
| 806. Mtg. Ins. Application Fee | to | | | | |
| 807. Assumption Fee | to | | | | |
| 808. Lender Document Review Fee | | Community Bank of Northern Virginia | | 150.00 | |
| 809. Lender Underwriting Fee | | Community Bank of Northern Virginia | | 295.00 | |
| 810. Lender Application Fee | | Community Bank of Northern Virginia | | 275.00 | |
| 811. PAY | | ANSOUTH BANK NA | | 7,500.00 | |
| 812. PAY | | MBNA AMERICA | | 4,792.00 | |
| 813. PAY | | 1ST ED CU | | 4,773.00 | |
| 814. PAY | | SEARS | | 4,510.00 | |
| 815. Additional Charges  *** See Attached Addendum *** | | | | 4,761.00 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | | | |
| 901. Interest from | to | @ $ | /day | Days | |
| 902. Mortgage Insurance Premium for | | to | | | |
| 903. Hazard Insurance Premium for | yrs | to | | | |
| 904. | | | | | |
| 905. | | | | | |
| **1000. RESERVES DEPOSITED WITH LENDER FOR** | | | | | |
| 1001. Hazard Insurance | | mo.@$ | /mo. | | |
| 1002. Mortgage Insurance | | mo.@$ | /mo. | | |
| 1003. City property taxes | | mo.@$ | /mo. | | |
| 1004. County property taxes | | mo.@$ | /mo. | | |
| 1005. Annual Assessments | | mo.@$ | /mo. | | |
| 1006. | | mo.@$ | /mo. | | |
| 1007. | | mo.@$ | /mo. | | |
| 1008. | | | | | |
| **1100. TITLE CHARGES** | | | | | |
| 1101. Settlement or closing fee | to | Resource Title, LLC | | 50.00 | |
| 1102. Abstract or title search | to | Resource Title, LLC/GAC | | 175.00 | |
| 1103. Title examination | to | Resource Title, LLC | | 695.00 | |
| 1104. Title insurance binder | to | | | | |
| 1105. Document preparation | to | Resource Title, LLC | | 175.00 | |
| 1106. Notary fees | to | | | | |
| 1107. Attorney's fees | to | | | | |
| (includes above items No: | | ) | | | |
| 1108. Title insurance | to | | | | |
| (includes above items No: | | ) | | | |
| 1109. Lender's coverage $ | | | | | |
| 1110. Owner's coverage $ | | | | | |
| 1111. | | | | | |
| 1112. | | | | | |
| 1113. Judgment Search | | | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | | | |
| 1201. Recording fees | Deed $ | ; Mortgage $  45.00 | ; Releases $ | 45.00 | |
| 1202. City/county/stamps | Deed $ | ; Mortgage $  83.25 | | 83.25 | |
| 1203. State tax/stamps | Deed $ | ; Mortgage $ | | | |
| 1204. | | | | | |
| 1205. | | | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | | | |
| 1301. Survey | to | | | | |
| 1302. Pest inspection | to | | | | |
| 1303. | | | | | |
| 1304. | | | | | |
| 1305. | | | | | |
| 1306. | | | | | |
| 1307. | | | | | |
| 1308. | | | | | |
| **1400. TOTAL SETTLEMENT CHARGES** (enter on lines 103 and 502, Sections J and K) | | | | 33,000.75 | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____
Carl L. Nelson                    Buyer/Borrower

_____              Seller

                                  Buyer/Borrower

                                                                        Seller

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

_____                    _____
Resource Title, LLC              Settlement Agent                         Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine or imprisonment.
For details see: Title 18 U.S. Code Section 1001 and Section 1010

RESPA, HB 4305.2 -- REV. HUD-1 (3/86)

**EXHIBIT 3**

3

1. Information contained in your credit report was used in connection with this offer.

2. This offer is made to you because you satisfied our initial criteria for creditworthiness.

3. This credit may not be extended if, after you respond, we find that you do not meet the criteria used to select you for this offer or any applicable criteria bearing on creditworthiness.

4. This offer is contingent upon receiving a valid first or second lien on your owner-occupied, one-to-four family residence or condominium excluding mobile homes, manufactured housing, and co-ops. Minimum and maximum property values apply and a property appraisal may be required. Loan amount may not exceed 125% of the value of your home minus the first mortgage balance. Final loan approval is subject to verification of acceptable income and credit. Minimum loan amount in connection with this offer is $15,000. Maximum loan amount is $75,000. Property type may affect maximum loan amount.

5. You have the right to prohibit the use of information in your file with any credit reporting agency in connection with any transaction you did not initiate, such as this offer, by notifying the agencies listed below:

| Equifax | Experian | TransUnion |
|---|---|---|
| P.O. Box 740256 | P.O. Box 919 | P.O. Box 97328 |
| Atlanta, GA 30374 | Allen, TX 75013 | Jackson, MS 39288-7329 |
| 1-888-567-8688 | 1-888-567-8688 | 1-888-567-8688 |

BACK OF VOUCHER

**Equity Guaranty**
Guaranty National Bank
*of Tallahassee*

DATE May 21, 2001

**Voucher Certificate**

| | DOLLARS | CENTS |
|---|---|---|
| | $56,850 | 00 |

THE SUM OF   Fifty Six Thousand Eight Hundred Fifty

2100\-0061-3897-000 \*\*\*\*\*\*\*\*\*\*AUTO\*\* 3-DIGIT 317

**FDIC**
FEDERAL DEPOSIT INSURANCE CORPORATION

RESERVATION NO.
RF21165935005

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# You are Pre-Approved for up to $56,850*

## or more...

EXAMPLE (see details below)**
Your Current Monthly Payments

Credit Card #1
Credit Card #2
Auto Loan
Home Computer
New Furniture
Medical/Dental payments

Total Payments

*or*   $295**

An EquityGuaranty
Debt Consolidation Loan

Dear ▮▮▮▮▮▮▮:

   Think what you could do with $56,850 or more right now! You could pay off high-interest debts and even have some cash left over. Because you're a homeowner, EquityGuaranty can help you keep more of your hard-earned paycheck in your pocket and get the cash you need!

   NO EQUITY, NO PROBLEM! An EquityGuaranty Debt Consolidation Loan is a smart plan to help you regain control of your finances. Consolidate your debts into a lower, easy-to-manage monthly payment and have cash left over to use however you wish

**THAT'S A SAVINGS OF $621 IN YOUR FIRST MONTH!***
TAX DEDUCTIBILITY MAY INCREASE SAVINGS (CONSULT YOUR TAX ADVISOR).**

## NO EQUITY REQUIRED!   Even if you do not have any equity in your home, call EquityGuaranty at 1-800-564-4833 today. We can usually give you an answer in 15 minutes or less. Take advantage of your pre-approved status to consolidate your high-interest debts and get the cash you need today.

## CALL EQUITYGUARANTY AT 1-800-564-4833 TODAY!

P.S. Your Pre-Approved Voucher expires July 5, 2001, so act now!
Monday - Thursday 8:30 am - 10:00 pm, Friday 8:30 am - 9:00 pm, Saturday 9:00 am - 5:00 pm (EST)

**EXHIBIT 2**


EQUAL HOUSING LENDER

* Actual loan amount may vary. See reverse for important details. All lender fees may be deducted from the loan amount or may be paid separately. Lender fees may vary by state
** Example uses an APR of 14.21% and term of 300 payments at $295 per month on a $28,000 loan amount. Your rate may vary according to your credit history and other factors. Origination fees and closing costs are included in the APR and may vary by state. Call for current rate information.
*** Your exact amount of savings may vary based on actual debt owed, time left on installment loans, and credit score. Savings of $621 represents a first month payment savings only

information contained in your credit report was used in connection with this offer.

3    This credit may not be extended if, after you respond, we find that you do not meet the criteria used to select you for this offer or any applicable criteria bearing on creditworthiness.

4    This offer is contingent upon receiving a valid first or second lien on your owner-occupied, one-to-four family residence or condominium, excluding mobile homes and manufactured housing. Minimum and maximum property values apply and a property appraisal may be required. Final loan approval is subject to verification of income and credit. Minimum loan amount in connection with this offer is $20,000

5    You have the right to prohibit use of information in your file with any credit reporting agency in connection with any transaction you did not initiate, such as this offer, by notifying the agencies listed below:

| Equifax | Experian | Trans Union |
|---|---|---|
| P.O. Box 740256 | P.O. Box 919 | P.O. Box 97328 |
| Atlanta, GA 30374 | Allen, TX 75013 | Jackson, MS 39288-7329 |
| 1-888-567-8688 | 1-888-567-8688 | 1-888-567-8688 |

If you don't have time to call, you may Fax this confidential application to us anytime... day or night. We will start processing your final application right away. Just fill in the Information in the box below, sign and date where indicated, and fax the form to our **Confidential Toll Free Fax number 1-877-423-1443**.

**DETACH HERE BEFORE FAXING.**

# CONFIDENTIAL FAX-APPLICATION FORM

| Borrower (Full Name) | Social Security # | Annual Salary | Birthdate |
|---|---|---|---|
| | | | / / |
| E-mail Address | | Work Phone | |

| Borrower (Full Name) | Social Security # | Annual Salary | Birthdate |
|---|---|---|---|
| | | | / / |
| E-mail Address | | Work Phone | |

| Property Address | City/State/Zip Code | | Years Lived There |
|---|---|---|---|
| Home Phone | 1st Mortgage Rate | Estimated House Value | Mortgage Payment / Balance |

Reservation Number _____ *(see upper right corner of opposite side)*

I (we) authorize the Lender to make whatever inquiries it considers necessary and Appropriate to evaluate this credit application

| Signature | Date | Signature | Date |
|---|---|---|---|

Best time to call you _____

The section below is provided for your convenience. Your personal loan advisor will assist you with filling in any missing information.

# Consolidation Worksheet

### Current Financial Obligations

| Creditor | $ You Owe | $ You Pay | Pay Off |
|---|---|---|---|
| *(Example)* VISA | $5,375 | $255 | ☑Yes ☐No |
| 1 | | | ☐Yes ☐No |
| 2 | | | ☐Yes ☐No |
| 3 | | | ☐Yes ☐No |
| 4 | | | ☐Yes ☐No |
| 5 | | | ☐Yes ☐No |
| 6 | | | ☐Yes ☐No |
| 7 | | | ☐Yes ☐No |
| 8 | | | ☐Yes ☐No |
| 9 | | | ☐Yes ☐No |
| 10 | | | ☐Yes ☐No |
| 11 | | | ☐Yes ☐No |
| TOTAL | $ | $ | |

Do you have a 2nd Mortgage Now? ☐Yes ☐No

If Yes: _____

| Balance | Rate% | Mo. Payment |
|---|---|---|

Comments: _____

*(Your Personal Loan Advisor will assist you in completing the below section)*

### New Loan Proposal

| Amount | Payment | Rate % | Term |
|---|---|---|---|

| Mo. Savings | Yearly Savings | Cash to you |
|---|---|---|

| Loan Advisor | Direct Toll Free # |
|---|---|

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

**FILED**

04  AUG 30  PM 4:32

U.S. DISTRICT COURT
N.D. OF ALABAMA

CLELL L. HOBSON, et al.,

    Individually, and as Representatives of a
    Class of Consumer Borrowers,

                        Plaintiffs,

v.

IRWIN UNION BANK AND TRUST
COMPANY, et al.,
                     Defendants.

Case No. CV-04-C-2351-W

## APPENDIX OF EXHIBITS

| Document | Exhibit No. |
|---|---|
| CBNV Mail Flyer | 1 |
| GNBT Mail Flyer | 2 |
| Hobson HUD Settlement Statement | 3 |
| Hobson TILA Disclosure Statement | 4 |
| Hobson HOEPA Section 32 Notice | 5 |
| Hobson Note | 6 |
| Kelly HUD-1 Settlement Statement | 7 |
| Kelly TILA Disclosure Statement | 8 |
| Kelly HOEPA Section 32 Notice | 9 |
| Kelly Note | 10 |
| Nixon HUD-1 Settlement Statement | 11 |
| Nixon TILA Disclosure Statement | 12 |
| Nixon HOEPA Section 32 Notice | 13 |
| Roberts HUD-1 Settlement Statement | 14 |
| Roberts TILA Disclosure Statement | 15 |
| Roberts HOEPA Section 32 Notice | 16 |
| Roberts Note | 17 |

(d)      For an Order appointing the undersigned counsel as Plaintiff Class Counsel;

(e)      For an Order certifying that this action may be maintained as a Defendant class action, as defined above, under Fed. R. Civ. P. 23(a) and 23(b)(3), appointing the Defendants and their respective counsel to represent the said Defendant Class;

(f)      For an Order directing that reasonable notice of the Plaintiff Class action be given to all members of the Plaintiff Class at the appropriate time after discovery and dispositive motions have been resolved and likewise an Order directing that reasonable notice of the Defendant Class be given to all members of the Defendant Class at the appropriate time as determined by the Court;

(g)      For violating RESPA, an Order and Judgment finding that the Defendants and the Defendant Class members are liable as a matter of law to each member of the Plaintiff Class for treble damages calculated on the amount of settlement fees kicked back or split with the Shumway Organization and its entities;

(h)      For violating RESPA, an Order and Judgment awarding RESPA treble damages to the Plaintiff Class members and against the Defendants and the Defendant Class members in accordance with the loans which were "made" or assigned to the said Defendants;

(i)      For violating the HOEPA requirements of 15 U.S.C. §§ 1635, 1638, and 1639, a declaration that those certain Plaintiff Class members whose loans were closed within the three-year preceding the filing of this case on July 30, 2004, remain entitled to rescind their loans and that Defendants are prohibited from foreclosing on the Plaintiffs' and Plaintiff Class members' mortgages;

(j)      For violating the HOEPA requirements of 15 U.S.C. §§ 1635, 1638, and 1639, an Order and Judgment finding that Defendants are liable as a matter of law to each Plaintiff Class member for all damages and declaratory and injunctive relief allowable under 15 U.S.C. §§

– 69 –

1635, 1639, 1640 and 1641(d), including, all (1) actual damages; (2) statutory damages; (3) rescission rights and damages; and (4) an amount equal to the sum of all finance charges and fees paid by the Plaintiff Class members for each and every *separate* HOEPA violation as to each and every *separate* borrower;

(k)    For violations of the above laws a finding of assignee liability under the provisions of HOEPA:

(l)    For violating RICO 18 U.S.C. § 1962(c) and 1962(d) the Defendants are jointly and severally liable as a matter of law to each member of the Class for actual damages;

(m)    For a trebling of the actual damages as provided in 18 U.S.C. § 1964(c);

(n)    For a permanent injunction enjoining Defendants and the Defendant Class members, together with their officers, directors, employees, agents, partners or representatives, successors and any and all persons acting in concert with them or by agreement with them from directly or indirectly engaging in the wrongful acts and practices described above, all for the benefit of the Plaintiff Class Members and other future borrowers;

(o)    For reasonable attorneys' fees as provided by law and statute;

(p)    For pre-and-post judgment interest as provided by law in amount according to proof at trial;

(q)    For an award of costs and expenses incurred in this action; and

(r)    For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted,

By

Michael Cartee, Esq. - No.CAR022
John Lloyd, Esq. – No. LLO006

CARTEE & LLOYD
2210 Eighth Street
Tuscaloosa, AL  35401
(205) 759-1554
(205) 758-9477 (FAX)

Knox McLaney, Esq. - No. MCL005
MCLANEY & ASSOCIATES, P.C.
P. O. Box 4276
Montgomery, AL 36104
(334) 265-1282
(334) 265-2319 (FAX_

John W. Sharbrough, Esq. – No. SHA037
THE SHARBROUGH LAW FIRM
156 St. Anthony Street
P.O. Box 996
Mobile AL  36601-0996
(251) 432-6620
(251) 432-5297 (FAX)

Scott Borison, Esq., Pro Hac Vice
LEGG LAW FIRM, LLC
5500 Buckeystown Pike
Frederick, MD 21703
(301) 620-1016
(303) 620-1018 (FAX)

J. Michael Vaughan, Esq., Pro Hac Vice
R. Frederick Walters, Esq., Pro Hac Vice
David M. Skeens, Esq., Pro Hac Vice
Garrett M. Hodes, Esq., Pro Hac Vice
WALTERS BENDER STROHBEHN
    & VAUGHAN, P.C.
2500 City Center Square
1100 Main Street
P.O. Box 26188
Kansas City, MO 64196
(816) 421-6620
(816) 421-4747 (FAX)

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

The undersigned counsel of record for the Plaintiffs does hereby certify having served the within and foregoing First Amended Class Action Complaint, Appendix of Exhibits thereto, and Motion for Leave to Amend Plaintiffs' Class Action Complaint, upon counsel, officers or registered agents as follows:

By hand delivery this date upon counsel for Irwin Union Bank and Trust Company:

> Wilson F. Green, Esq.
> Burr & Forman LLP
> Southtrust Tower
> 420 North Twentieth Street
> Birmingham, Alabama 35203

By first class certified mail, postage prepaid, return receipt requested as mailed by the Clerk of Court upon all other Defendants as follows:

> **HOUSEHOLD FINANCE, INC.**
> The Corporation Trust Company
> 1209 ORANGE STREET
> Wilmington, Delaware 19801

> **WILSHIRE FUNDING CORPORATION**
> CSC Lawyers Incorporating Service, Inc.
> 150 S. Perry St.
> Montgomery, Alabama 36104

> **RESIDENTIAL FUNDING CORPORATION**
> The Corporation Company
> 2000 Interstate Park
> Suite 204
> Montgomery, Alabama 36109

> **JP MORGAN CHASE BANK**
> The President or Managing Agent
> 4 New York Plaza
> 13th Floor
> New York, NY 10004

> **FAIRBANKS CAPITAL CORPORATION,**
> Thomas D Basmajian, CEO & Chairman
> 3815 South West Temple
> Salt Lake City, UT 84115

**CONSECO, INC.**
John R. Kline or his successor
Sr. Vice President
11825 North Pennsylvania Street
Carmel, Indiana, 46032

**MOREQUITY, INC.**
CSC Lawyers Incorporating Service
150 S. Perry Street
Montgomery, Alabama 36104

**COMMUNITY BANK OF NORTHERN VIRGINIA**
David P. Summers, or his successor
President and CEO
8150 Leesburg Pike
Vienna, Virginia 22182

This 30th day of August, 2004.

Michael Cartee, Esq. - No.CAR022
CARTEE & LLOYD
2210 Eighth Street
Tuscaloosa, AL  35401
(205) 759-1554
(205) 758-9477 (FAX)

COUNSEL FOR PLAINTIFFS